# Exhibit D

Redacted version of the TGLP (Monumental)

Agreement with the Lyric Opera House

ORIGINAL RECEI ^D

NOV 2 9 2004

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04

**FACILITY AGREEMENT**

This Facility Agreement is by and between **TICKETMASTER GROUP LIMITED PARTNERSHIP ("TGLP")**, a Maryland Limited Partnership, and **LYRIC PRODUCTIONS, LLC** ("Principal"), doing business as **LYRIC OPERA HOUSE.** This Agreement consists of this Facility Agreement and <u>Exhibit A</u>, Standard Provisions, and any other exhibits or riders attached hereto, which are incorporated herein by this reference.

In consideration of the premises and the mutual promises and covenants contained in this Agreement, the parties, intending to be legally bound, agree as follows:

1.   **SUMMARY OF BASIC PROVISIONS**

    (A)   This Agreement shall apply to each performance of all Events presented at the Facility during the Initial Term and any Renewal Terms thereof as set forth in Section 3(B) of <u>Exhibit A</u>.  The Initial Term of this Agreement shall be for **Five (5)** years, beginning on **November 1, 2004** and ending on **November 1, 2009.**

    (B)   Principal shall pay the following charges:

| | | |
|---|---|---|
| (1) | Facility Box Office Sales per Ticket (due upon receipt of Tickets, when Tickets provided): | $ |
| (2) | Outlet Sales per Ticket: | $ |
| (3) | Telephone Sales: | $ |
| | (a)  per Ticket: | $ |
| | (b)  credit card discount fee: of Gross Ticket Price [Section 4(D)(1) of <u>Exhibit A</u>] | — |
| (4) | One-Time Non-Refundable Programming Charge (due upon execution of this Agreement): | $ |
| (5) | Cancellation Charge per Ticket [Section 4(E) of <u>Exhibit A</u>]: | $ |
| (6) | Monthly Equipment rental [Section 6(A) of <u>Exhibit A</u>]: | $ |
| (7) | Data line charges [Section 6(A) of <u>Exhibit A</u>] | |
| | monthly fee:          **existing** | $ |
| | one-time installation fee:  **existing** | $ |
| (8) | Other:____none____ | $ |

**REDACTED** (rows 1–3)

**REDACTED** (rows 6–7)

    (C)   Settlement [Section 5(D) of <u>Exhibit A</u>]:  Settlement shall occur on the first Tuesday after the last performance of each Event presented pursuant to this Agreement.  Settlement shall be based on a Monday through Sunday sales week.  The payment of any proceeds due at settlement shall be paid by check payable to Principal and mailed to Principal's address at the time of settlement, or as otherwise mutually agreed in writing by TGLP and Principal.

    (D)   Facility: For purposes of this Agreement, Facility means:

        **Lyric Opera House**
        **1401 Maryland Avenue**
        **Baltimore, MD  21201**

    (E)   Equipment [Section 6 of <u>Exhibit A</u>]:  Equipment to be furnished by TGLP shall be as follows:

- **(2) Higher End PC's**
- **(4) Standard PC's**
- **(6) Flat Screens**
- **(6) Ticket Printers**
- **(2) Report Printers**
- **(6) Credit Card Keyboard Swipes**
- **(4)TicketFAST Bar Code Scanners**

1

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04

(F)     The following rider(s) have been appended to this Agreement and are hereby made an integral part of this Agreement:

| Rider A - | Facility Outlet Sales |
| Rider B - | Weekly Advances |
| Rider C - | Principal Participation in Service Charge Proceeds |
| Rider D - | Facility Fee |

In the event of a conflict between the terms of this Agreement and the terms of an appended rider, the terms of the appended rider shall prevail.

## 2.     TICKET SALE RIGHTS

(A)     Exclusivity.  Principal hereby grants to TGLP and TGLP's franchisees and licensees exclusive Outlet Sales and Telephone Sales rights for all Events.  TGLP's Ticket sales rights shall not be limited by any allocation of Tickets, and shall extend to all Open Seats to the same extent that such Open Seats are available through the Facility Box Office by walk-up purchase, subscription sales, group sales or otherwise.  Principal shall not permit any other party, including without limitation any other computerized Ticketing service, or online or Internet service provider, to issue or cause to be issued Tickets for any Event, nor permit any other party to sell, by allocation, voucher, Internet, Internet auction or otherwise, any Tickets for any Event.  Such Ticket sale rights shall inhere exclusively in Principal for Facility Box Office Sales and in TGLP and TGLP's franchisees and licensees for Outlet Sales and Telephone Sales.  The exclusivity granted herein is of the essence of this Agreement.  The only exception is for Baltimore Opera performances at the Lyric, which utilize their own system, however, may assign an allotment to Ticketmaster from time-to-time.

(B)     Promoter Agreements.  Principal shall cause all contracts or leases with Promoters to be subject to this Agreement, such that all Promoters shall be bound thereunder to the same extent as Principal.

## 3.     TICKET SALE PROCEDURES

(A)     Facility Box Office Sales.

(1)     All Facility Box Office Sales shall be issued exclusively through the System pursuant to the terms and conditions of this Agreement.

(2)     The System shall permit Principal to sell Tickets for all Open Seats for each Event, both in advance and as day-of-event sales, and shall also store and maintain pricing information (including discount or special promotional data), with respect to such Ticket sales.

(3)     Principal shall be responsible for the staffing of the Facility Box Office, and shall pay all wages and salaries, fringe benefits, payroll taxes and other costs relative to such personnel.  The operation of the Facility Box Office shall be under the direct supervision and control of Principal.

(4)     Principal and its employees shall function as TGLP's fiduciaries and shall exercise a high degree of care and trust in the handling of the Equipment and Ticket stock.  Principal shall remove from Facility Box Office duties any employee who is, in TGLP's reasonable judgment, unsuitable for operation of the Facility Box Office, unable to exercise due care of the Equipment or Ticket stock, or who has violated any of the terms of this Agreement or other written directive from TGLP.  Such required removal shall be from Facility Box Office duties only and involve termination of employment only at the sole discretion of Principal.

(B)     Financial Responsibility for Cancellations.  Principal shall cause all Promoters to establish an escrow for the refund of Tickets in the event of cancellation or closing, and to bear ultimate financial responsibility for the cancellation or closing of any Event for which Promoters use the Facility.

(C)     Returns and Exchanges.  All returns and exchanges for Events on sale shall be handled through the Facility Box Office or directly by the Promoter of the Event.  A returned or exchanged Ticket may be returned to the System without charge, but TGLP shall be entitled to keep any Facility Charges and Service Charge imposed on the initial sale of the returned or exchanged Ticket.

2

Facility Agreement
Revised By: SDK051404
Revised By:  RJB100804
Issued By:RJB11/02/04

## 4.     FINANCIAL CONDITIONS

Service and Handling Charge.  No Service Charge shall be imposed by TGLP on Facility Box Office Sales or complimentary or pre-pulled Tickets.  Principal may impose charges over and above the Net Ticket Price on Facility Box Office Sales; provided, however, that the amount and distribution of those additional charges shall be mutually agreed by TGLP and Principal.

[The next page is the signature page.]

Facility Agreement
Revised By: SDK051404
Revised By:  RJB100804
Issued By:RJB11/02/04

**IN WITNESS WHEREOF,** the parties have executed this Facility Agreement on the dates shown.

PRINCIPAL:  **LYRIC OPERA HOUSE**          **TICKETMASTER GROUP LIMITED PARTNERSHIP**

By: *H. Mebane Turner*   By: ~~signature~~

**Ralph J. Beyer
Senior Vice President**

Title: *Chairman of the Board*

|  |  |
|---|---|
| Address: | **1401 Maryland Avenue**<br>**Baltimore, MD  21201** |

**Centreplex Office Building
821 Capital Centre Boulevard
Largo, MD  20774**

Phone:     **410-685-0030**

**301-808-4320**

Fax:       **410-332-8234**

**301-808-4321**

E-Mail:    **vsr@lyricoperahouse.com**

**rbeyer@tmtickets.com**

FEIN#/SS#:  52-1507150

Date:   NOV 22, 2004

Nov 29, 2004
**Effective Date of Agreement**

4

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04

sdk092603

## EXHIBIT A

## STANDARD PROVISIONS

The following Exhibit A is a part of the foregoing and annexed agreement (the "Agreement") between Ticketmaster Group Limited Partnership ("TGLP") and the Principal named in the Agreement. TGLP and Principal agree that the provisions of this Exhibit A shall be fully binding on them as if such provisions were set forth in the Agreement. Capitalized terms used in this Exhibit A and not defined herein shall have the meanings set forth in the Agreement. In the event that any of the provisions of this Exhibit A conflict with the provisions of the Agreement, the applicable provision of the Agreement will govern.

## 1.    DEFINITIONS

In addition to the terms defined in Section 1 of the Agreement, for purposes of the Agreement, the following terms shall have the meanings set forth below:

Attraction means a musical or theatrical production, motion picture, concert, sporting event, circus, dance, show, display, convention, exhibit of art or other material, or other performance, event or activity of any nature or description for which Tickets are sold or issued.

Equipment means the terminal(s), Ticket printers, credit card swipe readers, and any other equipment furnished by TGLP to Principal pursuant to the Agreement. [This definition is applicable only if Principal has been provided with Equipment by TGLP.]

Event means (i) if the Agreement is a Ticket Sale Agreement, any Attraction for which Tickets are to be sold by TGLP pursuant to the Agreement, or (ii) if the Agreement is a Facility Agreement, any Attraction that is scheduled to take place or be presented or performed in or at the Facility.

Facility means (i) if the Agreement is a Ticket Sale Agreement, the location where an Event is to be presented, or (ii) if the Agreement is a Facility Agreement, the facility identified in Section 1(D) of the Agreement.

Facility Box Office means the box office and retail Ticket sale facilities located in or at the Facility.

Facility Box Office Sales means the sale of Tickets for Events through the Facility Box Office.

Gross Ticket Price means the purchase price for a Ticket for an Event, as established by Principal or the Promoter of the Event, plus all taxes and other charges paid by the Ticket purchaser, including the Service Charge and per Ticket credit card surcharge if applicable.

Inside Charges means the charges to be paid by Principal to TGLP pursuant to the Agreement, as summarized in Section 1(B) of the Agreement.

Market Area means Washington, D.C., the State of Maryland and the following jurisdictions in the Commonwealth of Virginia: the cities of Alexandria, Fairfax, Falls Church, Manassas and Manassas Park, and the counties of Arlington, Fairfax, Loudoun and Prince William.

Net Ticket Price means the Gross Ticket Price minus the Service Charge and any per Ticket credit card surcharge.

Open Seats means seats in or admissions to the Facility that are available for purchase by the general public.

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04

Outlet means TGLP-supplied Ticket selling equipment located anywhere other than in or at the Facility or a Telephone Sales location.

Outlet Sales means the sale of Tickets for an Event at locations other than the Facility Box Office, but excluding Telephone Sales.

Promoter means any third party who leases or otherwise uses the Facility for the presentation of an Event.

Service Charge means the amount charged by TGLP to Ticket purchasers for the use of the System, including per Ticket charges and per order charges.

System means the equipment, software and procedures established and maintained by TGLP for the purpose of selling, auditing and controlling the sale of Tickets for Attractions.

Telephone Sales means the sale of Tickets for Events by means of any form of electronic communications, including, but not limited to, one or more of the following, at TGLP's option: telephone, the Internet, "smart telephones", voice response units, or comparable computerized communications devices.

Ticket means a printed, electronic or other type of evidence of the right to occupy space at or to enter or attend an Attraction, including, without limitation, tickets printed using ticketFast™ at home or elsewhere by the purchaser even if not evidenced by any physical manifestation of such right, such as a "smart card."

## 2.     TICKET SALE RIGHTS

(A)     Ticket Price.  All Tickets to an Event sold through Outlet Sales or Telephone Sales shall be sold at the Gross Ticket Price.  Principal acknowledges that TGLP does not guarantee that any minimum or fixed number of Tickets will be sold.

(B)     Validity of Tickets.  Principal shall honor or cause to be honored all Tickets to an Event properly issued by the System.

## 3.     TERM

(A)     Initial Term.  The Agreement shall be effective for the Initial Term indicated in Section 1(A) of the Agreement, unless renewed or terminated earlier in accordance with the provisions of the Agreement.

(B)     Renewal Terms.  The Agreement shall be renewed automatically for successive two (2) year renewal terms, unless cancelled in writing by either party at least ninety (90) days prior to the expiration of the Initial Term or any renewal term.  Each renewal term shall be on the same terms and conditions as are contained in the Agreement, except that the Inside Charges set forth in Section 1(B) of the Agreement shall be adjusted upward to reflect any increase in the cost-of-living, as determined by the change in any reasonable government-issued index thereof selected by TGLP, which cost-of-living adjustment shall reflect the increase in such index using the first year of the Term as the base year for the cost-of-living adjustment.

(C)     Termination Without Cause.  Notwithstanding the provisions of Section 3(A) and/or 3(B) above, TGLP shall have the right to terminate the Agreement without cause by providing Principal at least sixty (60) days' prior notice of the termination date.

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04

4.   **TICKET SALE PROCEDURES**

(A)   <u>Payment and Collection.</u>  Principal hereby authorizes TGLP (i) to establish all policies with respect to accepting cash or credit cards for the payment of Tickets to the Events, and (ii) to collect the Gross Ticket Price for each Ticket to the Events sold by TGLP.

(B)   <u>Facility Box Office Sales.</u>  Principal shall not sell Tickets to Ticket brokers or to any other person under circumstances in which Principal knows or has reason to believe that the Tickets will be resold.  Scalping or brokering of Tickets by Principal or any employee or agent of Principal, or the providing of Tickets to third party scalpers or brokers through preferential sale or otherwise, or the providing of inside information concerning Attractions, shall be considered to be a material breach of the Agreement, and in the event of such breach, TGLP may terminate the Agreement immediately.

(C)   <u>Outlet Sales.</u>  TGLP shall sell Tickets to the Events by means of Outlet Sales.  TGLP, in its sole discretion, may increase or decrease the number of Outlets from time to time.  Outlet Sales shall be made in accordance with such arrangements as TGLP shall establish with the Outlet operators.

(D)   <u>Telephone Sales.</u>

(1)   TGLP shall sell Tickets to the Events by means of Telephone Sales, but TGLP shall not be required to sell tickets to the Event by more than one method of Telephone Sales, or by any particular method of Telephone Sales.  All Telephone Sales shall be made by such credit card (Discover, American Express, Visa or MasterCard) or other means of payment as TGLP accepts.  The credit card discount fee percentage set forth in Section 1(B)(3) of the Agreement shall be calculated on the Gross Ticket Price of Tickets to an Event and is subject to automatic proportional increases if the discount charged by the relevant credit card company to TGLP shall be increased.  In addition, Principal shall be responsible for paying TGLP the Gross Ticket Price of any Ticket charged back to TGLP by a bank for a credit card purchase unless such chargeback was caused solely by the negligence of TGLP.  TGLP reserves the right to withhold from each settlement ten percent (10%) of the Gross Ticket Price of all Tickets sold by means of Telephone Sales for a period of ninety (90) days, to be applied against chargebacks.  Tickets purchased through Telephone Sales ten (10) days or more in advance of an Event will be mailed by TGLP to the purchaser.  All other Tickets purchased through Telephone Sales will be delivered to Principal and held for customers at the "Will Call" window at the Facility Box Office.

(2)   Principal shall cause the "will call" window at the Facility Box Office to be open and accessible to customers whose Tickets are being held at the Facility Box Office at least two (2) hours prior to the starting time for an Event.  Principal shall verify the identity of each person picking up Tickets at the will call window by a valid photo identification (government issued) and the credit card used in the Ticket sales transaction.  Principal shall not release Tickets to any customer whose identity has not been so verified.

(E)   <u>Cancellations; Material Changes.</u>  If an Event is cancelled or closed after Tickets therefor have been sold through the System, or if a Material Change, as defined below, is made to an Event, Principal shall immediately notify TGLP by telephone and then in writing, and in no event shall such notification be subsequent to the time that such cancellation, closure or Material Change is announced or otherwise made public by Principal.  "Material Change" shall mean any change or cancellation of performer, talent, performance or display, type of seating (e.g., reserved seating or general admission), venue, location, date or time for an Event, or any other substantive change, whether to the Ticket text or otherwise, that would be reasonably likely to result in chargebacks or requests for refunds.  In such event, TGLP shall make refunds through the System, based on its usual and customary policy, for Tickets sold through Outlet Sales and Telephone Sales.  Principal shall pay to TGLP the cancellation fee set forth in Section 1(B)(5) of the Agreement in such case.  In the event of any Event cancellation, closure or Material Change, TGLP shall have the right, in its sole discretion, to withhold from settlement for a period of one hundred and twenty

7

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04

(120) days any amount of Ticket sale proceeds deemed reasonably necessary to ensure that Ticket purchasers' funds are adequately protected and available for proper refund. In the event of the cancellation or closing of any Event, TGLP shall have the right to retain any Inside Charges and Service Charges imposed on the sale of Tickets as though the cancellation or closing had not occurred.

## 5.    FINANCIAL CONDITIONS

(A)    Inside Charges.   Principal shall pay Inside Charges in the manner set forth in Section 5(D)(2) below.

(B)    Service and Handling Charge. TGLP may impose a per Ticket Service Charge on all Outlet Sales and Telephone Sales.  The Service Charge on Telephone Sales shall include a per order handling fee.  The amount of such Service Charges (including handling fees) shall be determined solely by TGLP, and TGLP may, at its sole discretion, increase such Service Charges from time-to-time.   All Service Charge revenue (including handling fees) shall be TGLP's property.

(C)    Taxes.  Principal shall be solely liable for, and shall pay as required, all amusement taxes or any other tax or fee obligation associated with the sale of Tickets or related activity conducted pursuant to the Agreement.  TGLP recommends but does not require that such tax obligations be included by Principal in the Ticket price.

(D)    Accounting Procedures.

(1)    TGLP shall be responsible for the collection and distribution of all proceeds from Outlet Sales and Telephone Sales.  If the Agreement is a Facility Agreement, Principal shall be responsible for the collection and distribution of all proceeds from Facility Box Office Sales.

(2)    TGLP and Principal shall make settlement for each Event in accordance with the schedule set forth in Section 1(C) of the Agreement.  Inside Charges (except those due and payable by Principal in advance or on an annual basis) and Service Charges shall be retained by TGLP.  In the event settlement for an Event has not been made on the settlement date as set forth in Section 1(C) of the Agreement, then Principal shall have thirty (30) days from such date in which to give TGLP written notice of Principal's request that TGLP immediately pay Principal the amount due at such settlement ("Settlement Payment Notice").  If Principal does not give TGLP Settlement Payment Notice, then at the expiration of the thirty (30) day Settlement Payment Notice period, Principal shall be deemed to have waived its right to payment of the amount due at such settlement, and TGLP shall not be required to pay, or be liable for, the amount otherwise due Principal at such settlement; provided, however, that this limitation of the period for which TGLP is liable for the settlement payment shall not apply if settlement has not occurred due to a bona fide dispute between the parties regarding such settlement.

(3)    Notwithstanding any other provision of the Agreement to the contrary, TGLP may settle with Principal based on the actual attendance at an Event (with the actual attendance allocated first to Tickets sold for cash or check) and defer settlement on unused Tickets charged to credit cards for a period of one hundred and twenty (120) days if, in TGLP's reasonable judgment, there is likely to be a greater than normal incidence of credit card chargebacks due to inclement weather or other circumstances that would tend significantly to reduce attendance at an Event.

(4)    Any payment made to Principal by TGLP shall be accompanied by TGLP's customary remittance report.  Such reports shall form the basis for settlement between the parties, and shall be conclusive as to any amounts owed to Principal by TGLP unless Principal submits a written objection to TGLP within ten (10) business days after receipt of any such report, setting forth in reasonable detail the respects in which Principal believes the report to be incorrect.

(5)    If any court ordered claim is duly presented to TGLP against any or all of the Ticket sale proceeds collected by TGLP for an Event prior to the remittance thereof to Principal, TGLP may, in its

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04

sole discretion, withhold remittance of those Ticket sale proceeds to Principal until such time as the claim is withdrawn or otherwise disposed of to TGLP's reasonable satisfaction.

(E)     End of Term.  Upon the expiration or termination of the Agreement, all obligations of Principal to TGLP hereunder shall become immediately due and payable in full without further notice from or demand by TGLP.

(F)     Audit of Sales.  Notwithstanding any other provision in the Agreement, TGLP shall have the right, at any time and from time to time, to audit Ticket sales for Events made by Principal and by others, including, but not limited to, Promoters and sponsors of any Event and the Facility Box Office, to assure compliance with the Agreement.

**6.     EQUIPMENT AND SUPPLIES** [This Section 6 is applicable only if Principal has been provided with Equipment by TGLP.]

(A)     Installation.  After the commencement of the Initial Term and following TGLP's approval of the physical facilities where the Equipment will be located, TGLP shall install and maintain, at its expense, the Equipment listed or described in Section 1(E) of the Agreement.  Principal shall lease the Equipment from TGLP at a monthly rental equal to the amount so specified in Section 1(B)(6) of the Agreement.  The first monthly rental payment for the Equipment shall be due on the date installation of the Equipment at the Facility is complete, and additional monthly rental payments shall be due and payable on the first day of each successive month thereafter.  If the first monthly rental payment is due on a date which is not the first day of the month, such rental payment shall be pro rated on a daily basis.  In addition to monthly rental payments for the Equipment, Principal shall pay TGLP a one-time data line installation fee in the amount specified in Section 1(B)(7) of the Agreement.  Such payment shall be due simultaneously with the first payment of monthly rental for the Equipment as set forth above.  Lastly, Principal shall pay TGLP a monthly data line service fee to reimburse TGLP for its cost in providing such data line.  The initial monthly data line service fee is set forth in Section 1(B)(7) of the Agreement.  Such monthly data line service fee is subject to increase, as TGLP's costs of providing such data line increase.  The monthly data line service fee shall be payable simultaneously with Principal's payment of rental for the Equipment as set forth above.

(B)     Additional Equipment.  If TGLP furnishes any additional Equipment to Principal after the initial installation at Principal's request, Principal shall lease that additional Equipment from TGLP at rates to be mutually agreed upon by the parties.

(C)     Substitutions.  TGLP shall have the right to substitute any part or all of the Equipment for any other comparable Equipment as TGLP reasonably deems necessary, provided that such substitution shall be done at TGLP's expense and shall not unreasonably interfere with the operation of the Facility Box Office.

(D)     Title to Equipment.  Principal understands and agrees that all Equipment is and shall remain TGLP's property.  Principal shall acquire no legal or equitable ownership interest in or title to any Equipment.  The Equipment and System shall remain the sole property of TGLP.  Principal shall have no right to transfer, license the use of or encumber any Equipment.  Principal shall keep all Equipment free and clear of all levies, liens and encumbrances.  At TGLP's request, Principal shall obtain a certificate in form satisfactory to TGLP from all parties with a real property interest in the premises wherein the Equipment is located waiving any claim with respect to the Equipment.  Principal shall give TGLP prompt written notice of any attachment or other judicial process affecting the Equipment.  TGLP may place labels or other identifying signs on each item of Equipment or other TGLP property at the Facility to evidence TGLP's ownership of such Equipment or property.  Principal shall not remove, cover, alter, deface or obliterate any such labels or signs.  TGLP shall be responsible for the repair and maintenance of all Equipment.

(E)     Dedicated Lines.  Principal shall install and maintain, at its expense, a dedicated electrical connection to furnish power to the Equipment.  The cost of all electricity and other utilities consumed in the

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04

operation of the Equipment shall be paid by Principal.  Principal shall install and maintain, at its expense, a dedicated telephone line from TGLP's central computer to the Equipment.

(F)     Training.  TGLP shall provide training for all Facility Box Office personnel in the use of the System.  This training will include instruction about the operation and care of the Equipment.  Only those employees of Principal who have been trained by TGLP shall use the Equipment.  Principal shall not permit any person not employed by Principal, or any untrained employee of Principal, to use the Equipment.

(G)     Use of Equipment.  Principal shall exercise a high degree of care of the Equipment.  Except as may be necessary to prevent damage to or destruction of the Equipment, Principal shall not move any Equipment from the area where it is installed, or make any addition or alteration to any Equipment, without TGLP's prior written consent.  The Equipment shall be used strictly in accordance with the instructions and manuals issued by TGLP, and Principal shall not permit the Equipment to be operated with any other software or be attached to any other computer or computer system, or used for any purpose beyond the scope of the Agreement without TGLP's prior written consent.  Principal shall notify TGLP immediately, by telephone, upon the malfunction of, or the discovery of any defect in any Equipment.

(H)     Tickets, Ticket Stock and Ticket Envelopes.

(1)     TGLP shall supply Principal, free of charge, all standard Ticket stock and standard Ticket envelopes necessary to sell Tickets at the Facility Box Office.  Principal shall use only such Ticket stock and Ticket envelopes as are supplied by TGLP, and shall promptly advise TGLP when Principal's Ticket stock or Ticket envelopes are in short supply.  Such Ticket stock and Ticket envelopes may contain advertisements sold by TGLP, and all revenue received from such advertisements shall be TGLP's sole and exclusive property.  TGLP shall retain sole and exclusive title to all blank Ticket stock.  Upon TGLP's request, Principal shall make an accounting to TGLP of all Ticket stock, and TGLP shall have the right to inspect Principal's inventory of Ticket stock during normal business hours.  Principal shall return to TGLP all Tickets which are returned to Principal or voided on the System, or are canceled, defaced, mutilated or otherwise rendered unfit for sale.

(2)     Principal shall keep all Ticket stock safe and secure and shall bear the risk of any theft, loss, destruction or unauthorized use of the Ticket stock upon delivery of such Ticket stock to Principal or Principal's authorized representative, agent or employee, regardless of fault, negligence or lack thereof.  Principal shall be responsible for all losses and damages arising out of or resulting from any Ticket stock delivered to Principal which is later determined by TGLP to have been used in the production of counterfeit Tickets.   The failure of Principal to prevent such activity shall be considered a material breach of the Agreement, and in the event of such occurrence, TGLP may terminate the Agreement immediately.

(I)     Return of Equipment.  Upon the expiration or termination of the Agreement, Principal shall return all Equipment to TGLP in good condition, reasonable wear and tear excepted, and return in good condition all unsold Tickets, unused Ticket stock, Ticket envelopes, and other supplies, signs, materials and devices that were furnished by TGLP to Principal.  TGLP shall be responsible for the actual removal of all Equipment, and shall have the right to enter the Facility Box Office to take possession of the Equipment and any remaining TGLP-furnished supplies and items, including Ticket stock.

**7.     ACCESS** [This Section 7 is applicable only if Principal has been provided with Equipment by TGLP.]

Principal shall give TGLP reasonable access to the Facility and the Facility Box Office to provide training, installation, maintenance, repair, assistance or other related services for the purpose of effectuating the Agreement and performing TGLP's duties thereunder.

10

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04

**8.     INSURANCE**  [This Section 8 is applicable only if Principal has been provided with Equipment by TGLP.]

Principal shall maintain throughout the Term of the Agreement, at its sole expense, a separate or blanket insurance policy, with TGLP as an additional insured party thereunder, insuring the Equipment and all materials and supplies provided by TGLP to Principal against loss or damage by the risks of direct physical loss in the amount of $5,000 per terminal.  This insurance policy shall include a specific endorsement to the effect that TGLP shall receive at least thirty (30) days' prior written notice before the modification or cancellation thereof.  Principal shall deliver to TGLP a copy of this insurance policy, as so endorsed, or a certificate verifying the existence thereof, promptly after the execution of the Agreement.  Principal shall promptly remit to TGLP all payments received under this insurance policy, and shall reimburse TGLP for any portion of the full replacement cost of any damaged or destroyed Equipment that is not covered by this insurance policy.

**9.     BANKRUPTCY**  [This Section 9 is applicable only if Principal has been provided with Equipment by TGLP.]

Principal shall give TGLP prompt written notice if Principal is adjudged bankrupt, makes an assignment for the benefit of creditors, files a petition for reorganization, arrangement or other relief under any bankruptcy or insolvency law, or if a receiver, custodian or trustee shall be appointed for Principal.  In the event of any of the foregoing, neither the Agreement nor any Equipment, Ticket stock, supplies or materials provided by TGLP thereunder shall be deemed an asset of Principal, and TGLP may terminate the Agreement immediately upon written notice to Principal.

**10.    ADVERTISING**

        (A)     By TGLP.  TGLP may, at its discretion, advertise Events in promotional displays located at Outlets or on Telephone Sales mail-out envelopes and other advertising and promotional materials used by TGLP, and if the Agreement is a Facility Agreement, TGLP may otherwise promote and advertise the Facility and any Event in advertisements placed directly by TGLP or in conjunction with others.   In connection therewith, TGLP may use the name of Principal, any Event, the Facility and all performers, artists and other persons involved in an Event, free of charge.

        (B)     By Principal.  Principal shall, in all advertising or other promotional material (whether print, broadcast or on-location) for an Event, include and feature (in reasonable size, boldness, prominence and importance, when printed) the TGLP name and logo and the Telephone Sales telephone number, and reference the availability of Tickets through Outlet Sales and Telephone Sales.  Principal shall identify TGLP only through the language and logotype furnished by TGLP to Principal, or through such other promotional logo or identification as TGLP may from time to time approve.

**11.    EVENT SET-UP**

No less than five (5) business days prior to the time when Tickets for an Event are to go on sale, Principal shall provide TGLP, in writing, all necessary information with respect to an Event, including seating layout, Ticket price structure, discounts, Ticket header information, entry information and any other information necessary for the proper sale of such Tickets.  Notwithstanding anything contained in the Agreement to the contrary, TGLP may rely upon the accuracy of the information furnished by Principal pursuant to this paragraph, and TGLP shall have no responsibility and Principal shall indemnify and hold TGLP harmless from and against any and all liabilities, claims, expenses (including court costs and attorneys' fees) and causes of action resulting from the inaccuracy of any information furnished by Principal pursuant to this paragraph.

11

Facility Agreement
Revised By: SDK051404
Revised By:  RJB100804
Issued By:RJB11/02/04

## 12.    INDEMNIFICATION

(A)    By Principal.  Principal shall defend, indemnify and hold TGLP harmless from and against all claims, suits, damages, liabilities, costs and expenses, including reasonable attorneys' fees, resulting directly or indirectly from (i) any breach of Principal's covenants, warranties and representations under the Agreement, (ii) any personal injuries to potential Ticket purchasers or others arising out of the claimant's presence at or in the vicinity of the Facility, the Facility Box Office or the Event, or (iii) the performance or nonperformance of the Event(s).  TGLP shall give Principal prompt notice of any claim or suit coming within the purview of this indemnity, shall furnish Principal with all relevant facts in its possession or under its control, and shall cooperate fully with Principal in the defense of any matter covered by this indemnity.

(B)    By TGLP.  TGLP shall defend, indemnify and hold Principal harmless from and against all claims, suits, damages, liabilities, costs and expenses, including reasonable attorneys' fees, resulting directly from System errors in the issuance of Tickets, so long as such errors in the issuance of Tickets were caused by the malfunction of the System and not by any acts or omissions of Principal, the owner of the Facility (if the Agreement is a Ticket Sale Agreement), or the Promoter of an Event (if the Agreement is a Facility Agreement), or their respective agents or employees.  Principal shall give TGLP prompt notice of any claim or suit coming within the purview of this indemnity, shall furnish TGLP with all relevant facts in its possession or under its control, and shall cooperate fully with TGLP in the defense of any matter covered by this indemnity.

(C)    No Termination.  The respective indemnification rights and obligations set forth herein shall continue in full force and effect notwithstanding the expiration or termination of the Agreement.

## 13.    DEFAULT

(A)    By TGLP.  If TGLP defaults in the performance of any covenants or agreements contained herein and such default continues for a period of ten (10) days after written notice of default has been given to TGLP, Principal may terminate the Agreement immediately upon notice to TGLP.  It is understood and agreed that occasional short-term interruptions of service that are reasonable under generally accepted industry standards shall not cause TGLP to be in default, or be grounds for any claim against or liability of TGLP under the Agreement.

(B)    By Principal.  If Principal defaults in the performance of any covenants or agreements contained herein and such default continues for a period of ten (10) days after written notice of default has been given to Principal, TGLP shall have all the remedies available at law and in equity and, in addition, may terminate the Agreement immediately upon notice to Principal.  Without limiting the generality of the foregoing, in the event of any Principal default under the Agreement, TGLP may suspend the sale of Tickets for Events through the System.

## 14.    INDEPENDENT CONTRACTORS

The relationship of TGLP and Principal shall be that of independent contractors, and nothing in the Agreement shall be construed so as to cause the parties to be joint venturers, partners, or employer and employee, or to cause either party to become liable for the debts or obligations of the other.

## 15.    COMPLIANCE WITH LAW

Principal and TGLP shall comply with all laws, regulations and ordinances applicable to each of them in connection with the operation of the System and their respective business activities.  Principal shall be responsible for obtaining, at Principal's expense, any permits, licenses, leases or other authorizations required by any applicable law, regulation or ordinance or otherwise necessary for the presentation or performance of each Event.

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04

16.    **ASSIGNMENT**

(A)    By Principal.  Principal may not assign, transfer, pledge or encumber all or any part of its rights or obligations under the Agreement without TGLP's prior written consent, which consent shall not be unreasonably withheld or delayed.  Any purported assignment, transfer, pledge or encumbrance without such prior written consent shall be ineffective, and shall not relieve Principal of its obligations under the Agreement.

(B)    By TGLP.  TGLP may assign or transfer the Agreement, and any revenues or other benefits receivable by TGLP thereunder, to TGLP's lender(s) or any other entity or person, provided that no such assignment shall relieve TGLP of its obligations under the Agreement without Principal's prior written consent, which consent shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, no consent shall be required where TGLP's successor-in-interest acquires all or substantially all of TGLP's business and assets, whether by purchase, merger, operation of law or otherwise.

(C)    Bind and Inure.  Subject to the foregoing provisions, the Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assignees.

17.    **FORCE MAJEURE**

Except for the payment of any amount due under the Agreement, neither party shall be liable to the other for damages in the event of any loss, damage, claim, delay or default arising by reason of Acts of God, storm, fire, flood, earthquake, labor disturbance (including strikes, boycotts, lockouts, etc.), war, international or domestic terrorism, civil commotion, shortages or unavailability of labor, present or future governmental law, ordinance, rule or regulation, technical or virus-related failure of the System, disruption of postal, electrical, telephone or other utility service, or other cause beyond the control of the party sought to be charged.

18.    **CONFIDENTIAL INFORMATION**

Principal acknowledges that the System and all related materials furnished to Principal represent highly confidential, proprietary information of TGLP, and constitute a valuable, special, and unique asset of and to the TGLP business.  Principal further acknowledges that the terms and provisions of the Agreement shall be deemed confidential information, and that disclosure of such information may result in loss or damage, financial or otherwise, to TGLP.  Accordingly, Principal agrees:  (i) that neither it nor its representatives will disclose or otherwise make available, at any time, any information, data, demonstrations or material concerning the System or its operation, or any of the terms or provisions of the Agreement, to any person who does not have a confidential relationship with Principal or TGLP; (ii) that Principal and Principal's representatives will protect such information, data and material with the same high degree of care that Principal exercises with its own confidential and proprietary information; and (iii) that upon the expiration or termination of the Agreement for any reason (including a default by Principal or TGLP), any written information, data or material concerning the System and its operations that has been obtained by Principal and all copies thereof will be promptly returned to TGLP or destroyed.  In the event Principal or Principal's representatives breach the provisions of this paragraph, TGLP may terminate the Agreement immediately, and Principal shall be responsible for all losses and damages arising out of or resulting from such breach. The obligations of confidentiality of Principal and Principal's representatives under this paragraph shall survive the expiration or termination of the Agreement.  Nothing contained in this paragraph shall prevent Principal from supplying or filing System information, data or materials to or with any court or other governmental authority in compliance with applicable law; provided, however, that Principal shall use reasonable means to prevent any further dissemination or public disclosure of that information, data or material.

19.    **MISCELLANEOUS**

(A)    Authority.  Each party represents and warrants that:  (i) such party has full right and

13

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04

authority to enter into and perform the Agreement in accordance with the terms thereof; (ii) the Agreement has been duly authorized, executed, and delivered by such party; and (iii) the Agreement constitutes a legal, valid, and binding obligation of such party, enforceable against such party in accordance with its terms.

(B)     Choice of Law.  The Agreement shall be governed by the laws of the State of Maryland except for the choice of law rules used in that jurisdiction.

(C)     Disputes; Choice of Forum.  If a dispute arises out of or relates to the Agreement, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Rules before resorting to arbitration, litigation, or some other dispute resolution procedure.  If a dispute cannot first be resolved by mediation, such dispute shall then be determined, at the option of TGLP, either (i) in the Courts of the State of Maryland located in Prince George's County, Maryland, or (ii) in arbitration before a three-member Arbitral Tribunal in Prince George's County, Maryland, pursuant to the then current Commercial Arbitration Rules of the American Arbitration Association; provided, however that discovery in any arbitration proceedings shall be limited to such discovery, if any, as the parties may agree upon.  The award of the Arbitral Tribunal shall be final and binding on the parties and may be enforced in any court of competent jurisdiction.  The parties agree that the proceedings as described above may not be removed to a United States District Court or transferred to another county in the State of Maryland.  The parties consent to personal jurisdiction in Prince George's County, Maryland, with respect to disputes as above described.  In any proceeding in which TGLP substantially prevails, Principal shall pay TGLP's reasonable attorneys' fees and costs.

(D)     Waiver of Claims.  Principal hereby knowingly and voluntarily waives all claims against TGLP arising from, relating to, or in connection with the Agreement, except as set forth in Section 12(B) above and in cases of gross negligence or willful misconduct by TGLP.

(E)     Waiver of Jury Trial.  Each party irrevocably waives the right to trial by jury in any action or proceeding in any court with respect to, in connection with, or arising under the Agreement.

(F)     Effect of Waiver.  No delay or omission to exercise any right or remedy accruing to TGLP upon any breach or default by Principal shall impair any such right or remedy or be construed to be a waiver of any such breach or default; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent, or approval on the part of TGLP or Principal of any breach or default under the Agreement, or of any provision or condition thereof, shall be in writing and shall be effective only to the extent specifically set forth in such writing.

(G)     Entire Agreement.  The Agreement constitutes the entire agreement between the parties and supersedes any and all prior agreements, written or oral, relating to the subject matter of the Agreement.

(H)     Severability.  In the event any provision in the Agreement is for any reason held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, but such provision may be made enforceable by a limitation or reduction in its scope, the parties agree to abide by such limitation or reduction as may be necessary so that the provision shall be fully enforceable.  If such provision cannot be made enforceable by a limitation or reduction in its scope, the Agreement shall be construed as if such unenforceable provision had never been contained herein and the remainder of the Agreement shall remain in full force and effect.

(I)     Notices.  Any notice or other communication to TGLP or to Principal shall be deemed properly given if such notice or communication is in writing and is hand delivered with receipt therefor or sent by certified or registered mail, postage prepaid, return receipt requested, to the address set forth in the Agreement or such other address as each party may designate by notice given in accordance with this paragraph.  Notices shall be deemed given when received or when delivery is refused.

Facility Agreement
Revised By: SDK051404
Revised By:  RJB100804
Issued By:RJB11/02/04

(J)     Limitation of Liability.   Notwithstanding any other provision of the Agreement to the contrary, in no event shall TGLP's liability to Principal hereunder in respect of any Event exceed the aggregate amount of Service Charges paid to TGLP for such Event.  In addition, TGLP shall not be liable for any lost revenue, lost profit, or incidental or consequential damages of any kind or nature, nor shall TGLP be liable for punitive or exemplary damages of any kind.

(K)     Legal Review.   Each of the parties to the Agreement has had the opportunity to have its legal counsel review the Agreement on its behalf.  If an ambiguity or question of intent arises with respect to any provision of the Agreement, the Agreement will be construed as if drafted jointly by the parties. The parties expressly agree that the construction and interpretation of the Agreement shall not be strictly construed against the drafter.

(L)     Counterparts.  The Agreement may be executed in counterparts, each of which shall constitute an original and all of which together shall constitute one instrument.

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04
sdk092603

## RIDER A – FACILITY OUTLET SALES

The following Rider A is a part of the foregoing and annexed Facility Agreement (the "Agreement") between Ticketmaster Group Limited Partnership ("TGLP") and the Principal named in the Agreement.  TGLP and Principal agree that the provisions of this Rider A shall be fully binding on them as if such provisions were set forth in the Agreement.  Capitalized terms used in this Rider A and not defined herein shall have the meanings set forth in the Agreement.

1.      Add the following definitions to Section 1 of Exhibit A of the Agreement:

         Client means the promoter of an Attraction, the operator of a facility in which Attractions are presented or performed, or any other person or entity, but not including Principal, that has the right to control or direct the sale of Tickets to an Attraction, and who has agreed to use the System for the sale of Tickets for that Attraction.

         Facility Outlet Sales means the sale of Tickets through the System at the Facility Box Office for Attractions other than those that are scheduled to take place in or at the Facility.

2.      Add the following section to the Agreement:

### FACILITY OUTLET AUTHORIZATION

         (A)      License.  TGLP hereby licenses and authorizes Principal to use TGLP-provided ticketing terminals at the Facility Box Office to make Facility Outlet Sales during the term of the Agreement and in accordance with the provisions of this Rider A.

         (B)      Exclusivity.  The parties acknowledge that it is essential to the success of the venture contemplated by this Rider A that the public come to identify the Facility Box Office as a TGLP Ticket sales outlet.  Accordingly, Principal agrees that it shall neither operate, nor permit others to operate, any other Ticket sale or distribution facility at the Facility Box Office during the term of the Agreement without TGLP's prior consent.

         (C)      Changes in Attraction(s).  TGLP reserves the right, at any time, to add or delete attractions and to change Ticket prices, the Service Charge, times and dates of performances, seating arrangements, and other terms and conditions relating to Facility Outlet Sales.  Principal shall comply with all instructions from TGLP concerning such matters.

         (D)      Facility Outlet Operation.

                  (1)      Identification.  The Facility Box Office shall be appropriately marked so as to permit its clear and ready identification by the public as a TGLP Ticket sales outlet.  TGLP shall provide Principal with appropriate signs and other promotional materials for display at the Facility Box Office, and, to the extent feasible, Principal shall provide prominent placement within the Facility Box Office for those materials.

                  (2)      Sales Tools.

                           (a)      TGLP shall furnish to Principal an "Outlet Operator's Manual", which Principal shall cause its personnel to read and understand.  Principal's employees shall at all times comply with such Outlet Operator's Manual and with all other written directives issued by TGLP concerning Facility Outlet Sales.

16

Facility Agreement
Revised By: SDK051404
Revised By:  RJB100804
Issued By:RJB11/02/04

(b)      TGLP shall provide Principal with a current Attraction guide, a loose-leaf notebook or other device setting forth facility seating diagrams, and other information relating to Attractions for which Tickets will be sold through the System.  Principal shall keep this information current in accordance with materials furnished by TGLP.  Principal's personnel shall gain sufficient familiarity with this information to be able to provide meaningful assistance to potential Ticket purchasers.

(3)      Hours of Operation.  Principal shall make Facility Outlet Sales during all hours when the Facility Box Office is open for business except that Principal reserves the right to decline to sell tickets for certain attractions if such Facility Outlet Sales would, in Principal's reasonable judgment, materially impair normal Facility operations and functions.

(4)      Facility Outlet Sale Procedures.

(a)      Principal shall sell and distribute Tickets only through the System, and shall collect the Gross Ticket Price for each Ticket sold.  Principal shall sell Tickets only to customers who appear in person at the Facility Box Office, and is expressly prohibited from selling Tickets to purchasers by consignment, by telephone, or by any means other than expressly permitted by the Agreement or this Rider A.  Principal shall conduct all Facility Outlet Sales in strict accordance with the Outlet Operator's Manual and such other written instructions as may be issued from time-to-time by TGLP.  Unless specifically so authorized by TGLP in writing, Principal shall not issue any Ticket without the concurrent sale thereof.

(b)      Principal shall collect the Gross Ticket Price in cash, or shall sell Tickets by charge transaction to Visa or MasterCard credit cards.  TGLP may specify from time-to-time that additional credit cards or other forms of payment may be accepted, and may specify terms of acceptance for such other credit cards or other forms of payment.  If Tickets are sold by credit card, such credit card sales shall be initiated through Equipment provided by TGLP, processed by a credit card processor chosen by TGLP and the Gross Ticket Price shall be collected by TGLP and not Principal, but Principal shall be due its share of Service Charge for credit card sales.  Principal shall comply with such reasonable cash sale or credit card sale procedures as TGLP may specify from time-to-time.  In the event that Principal does not comply with such sales procedures, or if credit card charges are declined or charged back to TGLP by a bank due to Principal's failure to properly process and administer the credit card transaction, Principal shall be fully liable for any resulting loss incurred by TGLP, including, but not limited to, the Net Ticket Price, TGLP's share of Service Charges, chargebacks to TGLP, and any fees or penalties paid by TGLP.  TGLP shall be responsible for remitting the Net Ticket price to the Client.

(5)      Ticket Sale Policies.      The following Ticket sale policies shall govern all Facility Outlet Sales:

(a)      Principal shall not sell Tickets to Ticket brokers or to any other person under circumstances in which Principal knows or has reason to believe that the Tickets will be resold.  Scalping or brokering of Tickets by Principal or any employee or agent of Principal, or the providing of Tickets to third party scalpers or brokers through preferential sale or otherwise, or the providing of inside information concerning Attractions, shall be considered to be a material breach of the Agreement, and in the event of such breach, TGLP may terminate the Agreement immediately.

(b)      Principal shall not knowingly sell ten (10) or more Tickets to any person for any Attraction without TGLP's prior consent.

(c)      Pursuant to the terms of Paragraph (D)(1) above, Principal shall post signs at the Facility Box Office stating that Tickets may not be purchased for resale.  Such signage shall be provided by TGLP at its expense.

(d)      TGLP reserves the right to further limit the number of Tickets that may be sold to one person and/or during any time period with respect to any Attraction(s).

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04

(e)     If Principal is authorized by TGLP to sell certain Tickets at a discount, and such discount is evidenced by a "coupon" or other writing, the coupon must be provided by Principal to TGLP.   Principal shall be liable to TGLP for the full face value plus Service Charge of any Tickets for which valid discount coupons are not provided to TGLP.

(6)     Refunds and Exchanges.  Principal shall not make refunds or exchange Tickets sold through Facility Outlet Sales except for those Attractions, dates, seats, and under such terms and conditions as TGLP may specify to Principal from time-to-time in writing.  Principal shall post signs at the Facility Box Office stating such terms and conditions of refunds and exchanges as TGLP shall specify.

(7)     Principal shall be responsible for providing staffing for Facility Outlet Sales and shall pay all wages and salaries, fringe benefits, payroll taxes and other costs relative to such personnel.  Such operation shall be under the direct supervision and control of Principal.  Principal shall remove from Facility Outlet Sales duties any employee who violates any term of this <u>Rider A</u> or the terms and conditions of sales as TGLP may from time-to-time specify to Principal.

(E)     <u>Financial Conditions for Facility Outlet Sales.</u>

(1)     Service Charges.  A Service Charge shall be imposed on the sale of all Facility Outlet Sales Tickets sold by Principal.   There shall be two (2) types of Service Charges, as follows: a "standard" Service Charge to be applied to all credit card sales, and a "cash discount" Service Charge to be applied to all cash sales.  The amount of the standard Service Charge and the amount of the cash discount Service Charge shall be established by TGLP at TGLP's sole discretion, and TGLP may raise or lower either or both types of Service Charge at any time and in such amounts as TGLP deems appropriate.

(2)     Cash Sale Payments and Trust Funds.  Principal shall hold IN TRUST and remit to TGLP (in the manner set forth in Paragraph (E)(4) below) the Gross Ticket Price of all cash sales, less Principal's share of the Service Charge revenue pursuant to Paragraph (E)(3) below, for each cash sale Ticket issued by Principal, regardless of whether or not such cash sale Ticket has been sold or payment therefor has been collected.  TGLP shall be responsible for remitting the Net Ticket Price to the Client.  Such funds held in trust by Principal for TGLP shall be defined as "Trust Funds".  All Trust Funds, while in the possession of or under the control of Principal, shall at all times be designated and held in trust separate and apart from any and all funds belonging to Principal or to any other person or entity whatsoever.  Principal expressly waives any claim of ownership of the Trust Funds, and shall not use any Trust Funds as its own property, as loans to itself, or as collateral for loans from third parties, or otherwise.  Trust Funds shall not be subject to assignment or alienation by Principal or to the claims of creditors of Principal.  Principal acknowledges and agrees that its obligations to remit and pay to TGLP all Trust Funds (less Principal's share of Service Charges as provided for in Paragraph (E)(3) below) shall be absolute and unconditional and shall not be subject to any abatement, reduction, setoff, defense, counterclaim or recoupment, or to any past, present or future claim that Principal may have against TGLP.   Any violation of the foregoing by Principal shall be considered a material breach of the Agreement, giving TGLP the right to terminate the Agreement immediately.  In the event that any Trust Funds are not remitted to or otherwise made fully available to TGLP at such time as required by this <u>Rider A</u>, TGLP shall have the right of offset against any funds or other payment due to Principal from TGLP pursuant to the Agreement or any other agreements between the parties.

(3)     Principal's Compensation.  Principal shall be entitled to retain   REDACTED
REDACTED                           REDACTED                    REDACTED
                           per Ticket for all Facility Outlet Sales transactions conducted pursuant to the Agreement and this <u>Rider A</u> regardless of whether such transaction was a cash transaction or a credit card transaction.  For Tickets sold by credit card at the "standard" Service Charge, TGLP shall be entitled to retain the entire difference between the amount of such "standard" Service Charge and the amount of the "cash discount" Service Charge.

Facility Agreement
Revised By: SDK051404
Revised By:  RJB100804
Issued By:RJB11/02/04

    (4)    Payment to TGLP.  All Ticket sales proceeds from Facility Outlet Sales, less only the amount of Service Charge revenue that Principal is entitled to retain pursuant to Paragraph (E)(3) above, shall be remitted by Principal to TGLP on Tuesday of each week with respect to Facility Outlet Sales made during the immediately preceding week (Monday through the following Sunday).   Such remittance shall be by check deposited in the U.S. Mail on the Tuesday when due, by wire transfer, or by any other means as TGLP shall reasonably specify.

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04
sdk092603
sdk092603

### RIDER B— WEEKLY ADVANCES

The following Rider B is a part of the foregoing and annexed Agreement (the "Agreement") between Ticketmaster Group Limited Partnership ("TGLP") and the Principal named in the Agreement. TGLP and Principal agree that the provisions of this Rider B shall be fully binding on them as if such provisions were set forth in the Agreement. Capitalized terms used in this Rider B and not defined herein shall have the meanings set forth in the Agreement.

Notwithstanding certain terms and conditions of the Agreement, TGLP shall make weekly advance settlement and transfer of net Ticket sale proceeds for Outlet Sales and Telephone Sales. The following terms shall apply:

     1.    Advance settlement shall be made on Tuesday for all Telephone Sales and Outlet Sales for all Events made during the immediately preceding week (Monday through the following Sunday), and shall be paid by check made payable to Principal and delivered through U.S. Mail, by wire transfer, or by any other means as TGLP shall reasonably specify.

     2.    Such advance settlement shall be for the "net" proceeds, and TGLP shall have the right to deduct, prior to remittance to Principal, any per ticket charges, credit card discount fees, or any other charges, fees, or any other monies due to TGLP at the time of each weekly advance settlement.

     3.    Any advance settlement proceeds previously paid to Principal for a particular Event shall be returned to TGLP in full in the event of any cancellation, postponement, or change in any performer listed in the ticket text of such Event, and such payment shall be made by Principal to TGLP within forty-eight (48) hours of such cancellation, postponement, or change. Such return payment shall be for the full face price of the Ticket and include any per ticket charges and credit card discount fees not previously deducted by TGLP.

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04
sdk092603

## RIDER C – PRINCIPAL PARTICIPATION IN SERVICE CHARGE PROCEEDS

The following <u>Rider C</u> is a part of the foregoing and annexed Agreement (the "Agreement") between Ticketmaster Group Limited Partnership ("TGLP") and the Principal named in the Agreement.  TGLP and Principal agree that the provisions of this <u>Rider C</u> shall be fully binding on them as if such provisions were set forth in the Agreement.  Capitalized terms used in this <u>Rider C</u> and not defined herein shall have the meanings set forth in the Agreement.

Notwithstanding terms to the contrary in the Agreement, Principal shall have a limited right to a share of Service Charges (but not handling charges) paid by Ticket purchasers to TGLP for the purchase of Outlet Sales and Telephone Sales Tickets.  The following terms shall govern that participation:

       1.      TGLP's remittance of Principal's Service Charge participation payments (the "Rebates") shall be made by the fifteenth (15th) of the month following the month in which the Event, to which the Service Charges as set forth in the Service Charge Chart below (the "Rebate Service Charges") applied, occurred.  TGLP may, at its sole discretion, increase the Rebate Service Charges and the per order handling fee set forth in the Service Charge Chart below from time-to-time.  Any increase to the Rebate Service Charges and per order handling fee made pursuant to this paragraph shall not result in an increase to the Rebates set forth in the Service Charge Chart below.

### <u>SERVICE CHARGE CHART</u>

REDACTED                    REDACTED

     2.              REDACTED

       3.      The Rebates shall not be due and payable by TGLP to Principal unless the Rebate Service Charges have been included in the Gross Ticket Price for the Event to which the Rebates apply. It shall be Principal's responsibility to ensure that the Rebate Service Charges are accurately applied to the Gross Ticket Price for each Event to which the Rebates apply prior to the sale of such Tickets to the public.

       4.      In the event TGLP has not remitted the Rebates to Principal by the fifteenth (15th) of the month following the month in which the Event, to which the Rebate Service Charges applied, occurred, then Principal shall have fifteen (15) additional days from such date in which to give TGLP written notice of Principal's request that TGLP immediately pay Principal the Rebates ("Rebate Payment Notice").  If Principal does not give TGLP Rebate Payment Notice, then at the expiration of the fifteen (15) day Rebate Payment Notice period, Principal shall be deemed to have waived its right to payment of such Rebates, and TGLP shall not be required to pay, or be liable for, such Rebates.

       5.      In the event of a cancelled Event, the Rebates will also be cancelled and any cancellation fees shall apply.

       6.      The Rebates apply to Events at Principal's facility only.  No double Rebates will be paid. Principal will either receive the Rebates or relinquish its rights to the Rebates to a designated party.  Only one Rebate will ever be paid to any one party, at any time.

Facility Agreement
Revised By: SDK051404
Revised By: RJB100804
Issued By:RJB11/02/04
sdk092603

### RIDER D – FACILITY FEES

The following Rider D is a part of the foregoing and annexed Agreement (the "Agreement") between Ticketmaster Group Limited Partnership ("TGLP") and the Principal named in the Agreement. TGLP and Principal agree that the provisions of this Rider D shall be fully binding on them as if such provisions were set forth in the Agreement. Capitalized terms used in this Rider D and not defined herein shall have the meanings set forth in the Agreement.

1.      Pursuant to the terms and conditions of this Rider D, TGLP shall collect on behalf of Principal a building service fee (a "Facility Fee"), which fee shall be included in the price of Tickets sold by TGLP through Outlet Sales and Telephone Sales. The Facility Fee shall be in the amount of **$3.00 (or lower)**, which amount may be increased or decreased upon the mutual agreement of TGLP and Principal, and the Facility Fee shall be in addition to, and not a part of, the Service Charge. The Facility Fee shall apply to each Event, unless TGLP and Principal mutually agree otherwise.

2.      In consideration of TGLP administering the Facility Fee on behalf of Principal,

# REDACTED

3.      TGLP's remittance to Principal of the Facility Fees shall be made by the fifteenth (15th) of the month following the month in which the Event, to which the Facility Fee applied, occurred. TGLP shall withhold from each such remittance the Facility Fee Processing Deductions, as set forth in Paragraph 2 above.

4.      The Facility Fees shall not be due and payable by TGLP to Principal unless the Facility Fee has been included in the Gross Ticket Price for the Event to which the Facility Fee applies. It shall be Principal's responsibility to ensure that the Facility Fee is accurately applied to the Gross Ticket Price for each Event to which the Facility Fee applies prior to the sale of such Tickets to the public.

5.      In the event TGLP has not remitted the Facility Fees to Principal by the fifteenth (15th) of the month following the month in which the Event, to which the Facility Fee applied, occurred, then Principal shall have fifteen (15) additional days from such date in which to give TGLP written notice of Principal's request that TGLP immediately pay Principal the Facility Fees ("Facility Fee Payment Notice"). If Principal does not give TGLP Facility Fee Payment Notice, then at the expiration of the fifteen (15) day Facility Fee Payment Notice period, Principal shall be deemed to have waived its right to payment of such Facility Fees, and TGLP shall not be required to pay, or be liable for, such Facility Fees.

# ORIGINAL

SLK090803
Issued by: RJB061009

**FIRST AMENDMENT TO
FACILITY AGREEMENT**

This Amendment is made and entered into on this __25TH__ day of **MARCH , 2009,** by and between TICKETMASTER GROUP LIMITED PARTNERSHIP ("TGLP"), a Maryland Limited Partnership, and **LYRIC PRODUCTIONS, LLC,** doing business as **LYRIC OPERA HOUSE** ("Principal").

## RECITALS:

A.    TGLP and Principal are parties to that certain **Facility Agreement**, dated **NOVEMBER 29, 2004 [(the "Agreement") / OR IF PREVIOUSLY AMENDED: (as amended, the "Agreement")]**

B.    TGLP and Principal desire to amend the Agreement.

Now, therefore, in consideration of the foregoing, the parties agree that the Agreement shall be amended as follows:

1.    **The original term of this agreement is hereby extended for two (2) years and eight (8) months, from November 1, 2009 through June 30, 2012.**

2.    **Rider C – Principal Participation in Service Charges is hereby replaced with new Rider C, dated March 25, 2009.**

3.    **Principal Charges 1.(B)(7) Data Line Charges waived effective April 1, 2009.**

4.    Ratification.  Except as amended, the Agreement is ratified and confirmed for all purposes and in all respects.

5.    Capitalized Terms.  All capitalized terms used herein but not defined herein shall have the meanings ascribed to them in the Agreement.

6.    Counterparts.  This Amendment may be executed in counterparts, each of which shall constitute an original and all of which together shall constitute one instrument.

**IN WITNESS WHEREOF,** the parties hereto have executed this Amendment on the day and year first above written.

| | |
|---|---|
| **PRINCIPAL:**  **LYRIC OPERA HOUSE** | **TICKETMASTER GROUP LIMITED PARTNERSHIP** |
| By: | By: |
| | Ralph J. Beyer<br>Senior Vice President |
| Name:  **Sandy Richmond** | |
| Title:  **President, Lyric Foundation** | |
| Date:  1/30/09 | Date:  8/1/09 |