IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDRE BOURGEOIS,
Individually and on behalf of a class of
others similarly situated,

    *Plaintiff,*

    v.

LIVE NATION ENTERTAINMENT,
INC., *et al.*,

    *Defendants.*

Civil Action No. ELH-12-58

## CERTIFICATION ORDER

TO THE HONORABLE CHIEF JUDGE AND ASSOCIATE JUDGES OF THE COURT OF APPEALS OF MARYLAND:

On or about November 22, 2011, Andre Bourgeois, plaintiff, on behalf of himself and a proposed class of others similarly situated, filed suit in the Circuit Court for Baltimore City against Live Nation Entertainment, Inc. ("Live Nation"); its licensee, Monumental Ticketing Limited Partnership ("Monumental") (collectively with Live Nation, "Ticketmaster"); and Lyric Productions, LLC d/b/a Lyric Opera House (the "Lyric"), defendants, challenging the legality of Ticketmaster's collection of "service charges" for tickets to entertainment events in Baltimore City, including but not limited to events presented at the Lyric. Defendants timely removed the suit to federal court on the basis of federal question jurisdiction, supplemental jurisdiction, and diversity jurisdiction under the relaxed "minimal" diversity-of-citizenship requirements of the Class Action Fairness Act. *See* 28 U.S.C. §§ 1331, 1332(d), 1367, 1441, 1446, 1453.

Plaintiff's complaint contains nine counts,[1] all of which relate to his contention that Ticketmaster's collection of service charges violates two subtitles of the Baltimore City Code: Article 15, Subtitle 21 (captioned "Ticket Agencies"), and Article 19, Subtitle 55 (captioned "Ticket Sales"). The text of these ordinances appears on pages 4-6, *infra*.

The first four counts of the complaint, which are asserted against all defendants, are as follows: (I) Money Had and Received; (II) Negligent Misrepresentation; (III) Violation of the Maryland Consumer Protection Act, Md. Code (2005 Repl. Vol., 2011 Supp.), §§ 13-101 *et seq.* of the Commercial Law Article; and (IV) Deceit by Non-Disclosure or Concealment. The other five counts allege claims against various combinations of the defendants for violations of several provisions of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*[2]

To this court's knowledge, the ordinances at the center of the parties' dispute have not been interpreted by the Maryland appellate courts. Moreover, the viability in Maryland of a claim for "money had and received" (Count I), based on the violation of a local ordinance, is uncertain in light of present Maryland appellate case law. Accordingly, the United States District Court for the District of Maryland, exercising the privilege afforded it by the Maryland Uniform Certification of Questions of Law Act ("Certification Act"), Md. Code (2006 Repl. Vol., 2011 Supp.), §§ 12-601 *et seq.* of the Courts & Judicial Proceedings Article ("C.J."), certifies four questions of Maryland law to the Court of Appeals of Maryland.

---

[1] A copy of the complaint is included as Exhibit A to this Order.

[2] The latter five counts are numbered Counts VI through X. The complaint does not contain a "Count V."

- 2 -

## I. Questions Certified

1. Where a ticket agency is authorized in writing by a licensed exhibitor to sell tickets to an event, and the ticket agency collects both the established price printed on the ticket and an additional, separately-stated per-ticket service charge that would not be charged as part of the established ticket price when tickets are sold directly by the exhibitor, does the exception contained in Article 15, § 21-1(b) of the Baltimore City Code apply, so as to exempt the ticket agency from the requirement of licensure, *see id.* § 21-1(a), and from the limitation of maximum service charges, *see id.* § 21-2?

2. Does Article 19, § 55-1(a) of the Baltimore City Code prohibit the collection of a service charge, in addition to the established price printed on a ticket in connection with the original sale of the ticket by the exhibitor or the exhibitor's authorized agent? Or, instead, does § 55-1(a) apply only to ticket resales?

3. If Article 19, § 55-1(a) applies to original ticket sales, does the exception contained in § 55-1(b) apply, so as to allow a seller of tickets to charge a per-ticket service charge in addition to the established price printed on the ticket, where the seller is not licensed under Article 15, § 21-1(a), and the service charge exceeds the maximum service charge permitted under § 21-2, but the seller is exempt from licensure under § 21-1(b)?

4. Does Maryland recognize a common-law cause of action for money had and received and, if so, may a claim for money had and received be maintained to recover money collected in violation of the above-referenced Baltimore City ordinances?

## II. Statement of Relevant Facts

### A. Ordinances

As noted, this case concerns the interpretation and application of two subtitles of the Baltimore City Code: Article 15, Subtitle 21 (captioned "Ticket Agencies"), and Article 19, Subtitle 55 (captioned "Ticket Sales"). The text of these ordinances is as follows:

**ARTICLE 15**
**LICENSING AND REGULATION**
\* \* \*
**SUBTITLE 21**
**TICKET AGENCIES**

### § 21-1. License required.

(a) *In general.*

No person shall engage in the business of selling the tickets, cards, or other tokens evidencing the right of admission to exhibitions, performances, games, or sports conducted by licensees under licenses issued by the State of Maryland or [the] City of Baltimore, or shall open or conduct an office, agency, or other place by whatever name known at which such tickets are sold or offered for sale, unless a license shall have been issued to such persons by the Director of Finance upon the payment of the fee herein prescribed.

(b) *Exception.*

Provided, however, that no license shall be required of any agent duly authorized in writing by a licensed exhibitor to sell tickets for said licensee at the established price printed thereon.

(c) *Scope; term; fee.*

(1) Each such license shall be limited to a single location or place of business and shall expire on January 1 next ensuing the grant thereof.

(2) The fee for such a license shall be $250 and the said license fee shall not be prorated.

### § 21-2. Maximum service charge.

A licensee under this section, or any officer or employee thereof, shall not directly or indirectly exact, accept, or receive for any ticket or token of admission to an exhibition, performance, game, or sport conducted by a licensee under a license granted by the State of Maryland, or the City of Baltimore, any greater amount than 50¢ in excess of the sum of the regular or established price or charge therefor printed on the face of such ticket, plus the amount of any tax imposed by the Government of the United States or by the State of Maryland upon such ticket or the right of admission thereunder.

### § 21-3. "Scalping" prohibited.

(a) *Price to be on ticket.*

Wherever the right of admission to any licensed exhibition or performance or to any game or sport where a charge is made is evidenced by a ticket,

- 4 -

card, or other token, the regular or established price or charge therefor shall be conspicuously printed thereon.

(b) *Sale for more prohibited; penalties.*

(1) If such licensee, or any of his officers or employees, shall extract, accept, or receive, directly or indirectly, any greater amount than such regular or established price or charge, plus the amount of any tax imposed by the Government of the United States or the State of Maryland:

(i) the license of such licensee may be revoked and annulled; and

(ii) such licensee, officer, or employees shall be guilty of a misdemeanor and, upon conviction thereof, shall be subject to a fine of not more than $500 for each such violation.

(2) The sale of each ticket in violation thereof shall constitute a separate offense.

## § 21-4. Revocation of licenses.

The license of any licensee under this subtitle may be revoked and annulled by the Director of Finance for any violation of this subtitle.

## § 21-5. Penalties for operating without license.

Any person who shall engage in any business or conduct an office, agency, or other place for which a license is required by this subtitle, without procuring such license, shall be guilty of a misdemeanor and, upon conviction thereof, be subject to a fine of not more than $500 and to imprisonment for not more than 6 months, or both, in the discretion of the Court.

\* \* \*

### ARTICLE 19
### POLICE ORDINANCES
\* \* \*
### SUBTITLE 55
### TICKET SALES

## § 55-1. Ticket scalping.

(a) *Prohibited conduct.*

It shall be unlawful for any person, firm, association, or corporation to sell or exchange, or offer to sell or exchange, for more than the price stated thereon or for remuneration in any form greater than such price, any ticket or tickets for admission to a public amusement, athletic, educational, or other event in the City of Baltimore.

(b) *Exception.*

Nothing in this section shall be construed to make illegal or invalidate the excess sum which is permitted to be charged for certain tickets by a person engaged in the business of selling tickets under the provisions of Article 15, Subtitle 21{"Ticket Agencies"} of the City Code.

(b-1) *Enforcement by citation.*

(1) In addition to any other civil or criminal remedy or enforcement procedure, this section may be enforced by issuance of a civil citation under City Code Article 1, Subtitle 41 {"Civil Citations"}.

(2) The issuance of a civil citation to enforce this section does not preclude pursuing any other civil or criminal remedy or enforcement action authorized by law.

(c) *Penalties.*

(1) A violation of the provisions of this section shall be deemed to be a misdemeanor and, upon conviction thereof, shall be subject to a fine of not more than $1,000.

(2) The sale or exchange of, or offer to sell or exchange, each ticket in violation of the provisions of this section shall be treated as a separate offense.

## § 55-2.  Street sales of theater and circus tickets.

(a) *Sale on public streets prohibited.*

It shall not be lawful for any person or persons to sell, barter, or exchange or offer for sale, barter, or exchange, upon the public streets or highways, tickets of admission to any theatre or circus.

(a-1) *Enforcement by citation.*

(1) In addition to any other civil or criminal remedy or enforcement procedure, this section may be enforced by issuance of a civil citation under City Code Article 1, Subtitle 41 {"Civil Citations"}.

(2) The issuance of a civil citation to enforce this section does not preclude pursuing any other civil or criminal remedy or enforcement action authorized by law.

(b) *Penalties.*

Any person who violates a provision of this section is guilty of a misdemeanor and, on conviction, is subject to a fine of not more than $1,000 for every offense.

### B. Procedural Posture

Plaintiff seeks to conduct this case as a class action. Plaintiff's proposed class is defined to include all persons or entities that purchased through Ticketmaster one or more tickets for admission to an event or events in Baltimore City, within four years of the date that suit was instituted. The proposed class also includes a subclass, defined as all members of the larger class who purchased tickets to events held at the venue operated by the Lyric.[3]   Along with his complaint, plaintiff filed a motion to certify the class, which was pending for decision when the defendants removed the case to federal court. I have not yet ruled on the issue of class certification.

As indicated, all nine of the counts in the complaint are predicated, in whole or in part, on the contention that defendants' collection of service charges is unlawful because it violates the aforementioned provisions of the Baltimore City Code. Defendants filed motions to dismiss in January 2012, which were fully briefed by the parties. In their motions, defendants argued that the imposition of service charges as alleged does not violate the Baltimore City ordinances as a matter of law. They also contended that, even if their conduct violates the ordinances, plaintiff cannot redress the violations through any of the causes of action he asserts. In particular, because the City ordinances do not contain a private right of action, defendants argued that plaintiff cannot maintain a suit for their violation. Moreover, they maintained that plaintiff's claim for money had and received must fail, because Maryland does not recognize such a cause of action, at least not where the parties' relationship is governed by a contract. According to defendants, plaintiff expressly agreed to purchase the tickets with the service charges and, having

---

[3] Officers and directors of the defendants and personnel of the court are expressly excluded from the class and subclass.

received the benefit of his bargain, cannot now reallocate the benefits and burdens of the parties' agreement by seeking to recover the service charges he knowingly paid.

Concurrent with his opposition to defendants' motions to dismiss, plaintiff filed a motion to certify to the Maryland Court of Appeals the questions concerning the proper interpretation of the Baltimore City ordinances. In an Order dated May 7, 2012, I informed the parties that I intended to grant the certification motion, and also intended to certify to the Court of Appeals the question of the viability of plaintiff's cause of action for money had and received. Therefore, I denied the defendants' motions to dismiss, without prejudice to the filing of new motions to dismiss after the Court of Appeals has resolved the governing questions of state law.

## C. Factual Background[4]

Ticketmaster operates a nationwide ticket agency business through which it conducts original ticket sales to events on behalf of performance venues and promoters, pursuant to written agreements with the venues and promoters. The sales that are relevant to this lawsuit are Ticketmaster's sales of tickets to events in Baltimore City. Ticketmaster is not licensed as a ticket agency under Article 15, Subtitle 21 of the Baltimore City Code.[5]

---

[4] The facts set forth here are drawn primarily from plaintiff's complaint. Because the case is presently at the pleading stage, no findings of fact have yet been made, and defendants do not concede the truth of the facts alleged by plaintiff. In light of the procedural posture of the case, however, I have assumed the truth of the well pleaded factual allegations of plaintiff's complaint. *See, e.g., E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) ("When ruling on a Rule 12(b)(6) motion to dismiss, 'a judge must accept as true all of the factual allegations contained in the complaint,' [and] 'draw all reasonable inferences in favor of the plaintiff.'") (citations omitted).

[5] As noted, "Ticketmaster" refers collectively to Live Nation and Monumental. The history of the dealings between Live Nation and Monumental and their predecessors in interest is set forth in Live Nation's memorandum in support of its motion to dismiss (ECF 19-3), which is included as Exhibit B to this Order. (Although these facts were not alleged by plaintiff in his Complaint, plaintiff does not dispute them.)                           *(cont'd on next page...)*

The ticket sales at issue include, but are not limited to, sales of tickets to events presented by the Lyric, which operates a theater for live performances in Baltimore City. The Lyric and Ticketmaster are parties to an agreement (the "Facility Agreement") under which Ticketmaster has the exclusive right to sell tickets by telephone or over the internet to events held at the Lyric (except for performances of the Baltimore Opera).[6]  The Lyric retains the exclusive right to sell tickets in person at the Lyric's box office, although it utilizes Ticketmaster's ticketing system to conduct such sales.

In brief (and in somewhat oversimplified terms), from 1991 until January 2011, Monumental was known as Ticketmaster Group Limited Partnership. During that time period, Monumental was a licensee of Ticketmaster Entertainment, LLC ("Ticketmaster Entertainment"), a national ticket sales business. Under the licensing agreement, Monumental held the exclusive right to conduct sales of tickets to events in Maryland, Virginia, and the District of Columbia using Ticketmaster Entertainment's ticket sales and distribution system and service marks (including the Ticketmaster website, www.ticketmaster.com). This licensing arrangement was unique; elsewhere in the country, Ticketmaster Entertainment contracted directly with venues and promoters to sell tickets on their behalf as their ticketing agent.

In January 2010, Live Nation acquired Ticketmaster Entertainment. In January 2011, Live Nation purchased all of the assets of Monumental, ending the licensing arrangement. In connection with the asset sale, Monumental changed its name from Ticketmaster Group Limited Partnership to Monumental Ticketing Limited Partnership. Since the asset sale, Live Nation, through its now-wholly-owned subsidiary Ticketmaster Entertainment, has conducted sales of tickets in Maryland, Virginia, and the District of Columbia using the Ticketmaster system and marks. Monumental is no longer engaged in any ongoing business.

[6] The Facility Agreement was originally executed by the Lyric and Monumental (under its former name Ticketmaster Group Limited Partnership) in November 2004, for a five year term. A copy of the Facility Agreement, redacted to protect certain confidential proprietary information, is included as Exhibit C to this Order. (An unredacted version of the Facility Agreement has been filed under seal in this proceeding. If the Court of Appeals wishes to review the unredacted Facility Agreement, the parties are hereby authorized to submit it to the Court of Appeals.) In November 2009, by a "First Amendment to Facility Agreement" that is also included in Exhibit C, the Lyric and Monumental renewed the Facility Agreement, with minor modifications, for a further term of two years and eight months, expiring June 30, 2012. Live Nation assumed Monumental's rights and responsibilities under the Facility Agreement in connection with the January 2011 sale of Monumental's assets to Live Nation.

Ticketmaster assesses "service charges," in addition to the "face value" price charged for each ticket purchased by telephone, over the internet, or at one of Ticketmaster's sales "outlets." The Lyric's box office is a Ticketmaster "outlet." Thus, the Lyric sells tickets for events presented at its own venue, for which it does not impose service charges. And, it sells tickets via the Ticketmaster system for events at other venues, including other venues in Baltimore City, for which it collects service charges on Ticketmaster's behalf.

Pursuant to the Facility Agreement, the amount of the service charges is set by Ticketmaster. As noted, the service charges are not assessed by the Lyric for in-person sales at the Lyric's box office of tickets to Lyric events. For each ticket to a Lyric event sold by telephone, over the internet, or at another Ticketmaster "outlet," Ticketmaster remits the entire face value of the ticket to the Lyric, along with a portion of the service charges, which is characterized in the Facility Agreement as a "rebate."

Mr. Bourgeois purchased a ticket from Ticketmaster to a concert by the singer-songwriter Jackson Browne, which was held at the Lyric on November 9, 2009. Mr. Bourgeois bought the ticket over the internet using Ticketmaster's website (www.ticketmaster.com); he did not purchase the ticket from the Lyric's box office. The face value of the ticket—the price that was publicly advertised and that was printed on the ticket—was $52. That is the price that Mr. Bourgeois would have been charged if the ticket had been purchased from the Lyric's box office. However, because Mr. Bourgeois purchased the ticket via Ticketmaster's website, he was charged more than $12 in additional "service charges." The amount of the service charges was disclosed to Mr. Bourgeois during the purchase process, before he agreed to purchase the ticket.

- 10 -

The $52 face value of the ticket, along with a portion of the service charges, allegedly was later

remitted by Ticketmaster to the Lyric.[7]

### III. Discussion

#### A. Parties' Contentions

The parties fundamentally disagree as to the proper interpretation and effect of the

Baltimore City ordinances at issue. According to plaintiff, Ticketmaster is not licensed to

"engage in the business of selling . . . tickets" under Article 15, § 21-1 of the Baltimore City

Code, and therefore is not entitled to collect service charges under Subtitle 21. Of course, even if

Ticketmaster were licensed, the service charges that it collects far exceed the maximum 50¢

---

[7] Defendants included in their proposed statement of facts the assertion that, in
purchasing the ticket, Bourgeois was "presented with" Ticketmaster's website terms of use and
necessarily agreed to be bound by the terms of use in using the website and purchasing his ticket.
However, those allegations are not in plaintiff's complaint. Defendants provided with their
motions to dismiss purported printouts of the front page of the Ticketmaster website and the
terms of use, as they allegedly appeared on the date of Mr. Bourgeois's ticket purchase. Copies
of these documents are attached as exhibits to Live Nation's motion to dismiss (Exhibit B to
this Order). However, it is not clear that plaintiff agrees to the authenticity of these documents.

Assuming the documents' authenticity, the website purports to state that any use of the
website constitutes agreement to the terms of use (this statement is in very fine print, at the
bottom of the webpage, along with a copyright notice). In turn, the terms of use contain a
provision stating: "The sale or purchase of tickets to entertainment events may be regulated by
certain state, county and city laws or regulations. You acknowledge that complying with laws is
your responsibility, AND YOU AGREE NOT TO HOLD US LIABLE FOR YOUR FAILURE
TO COMPLY WITH ANY LAW OR OUR FAILURE TO NOTIFY YOU OF, OR PROPERLY
APPLY, ANY LAW." (Underline emphasis added.)

In their motions to dismiss, defendants argue that Mr. Bourgeois does not "have a
cognizable claim under Maryland law for 'money had and received' because his ticket purchase
was governed by the contract he entered into when he purchased the ticket via Ticketmaster
Entertainment's website." ECF 52 at 8. I mention this here because the alleged contractual
agreement concerning the terms of use may constitute an affirmative defense to liability, but
more important for this proceeding, the existence of a contractual relationship between the
parties (separate and apart from the specific alleged contractual waiver of liability quoted above)
may also affect the viability of a cause of action for money had and received.

charge permitted by § 21-2. Plaintiff recognizes that Ticketmaster is "authorized in writing by a licensed exhibitor," *i.e.*, the Lyric, "to sell tickets for said licensee," which ordinarily would qualify a ticket selling agency for the exception to licensure under § 21-1(b). Ticketmaster's problem, in plaintiff's view, is that it does not sell tickets "at the established price printed" on the tickets—rather, it sells them for the "established price" plus the service charges—thereby removing it from the § 21-1(b) exception.

Plaintiff also maintains that defendants' sales of tickets violate Article 19, § 55-1(a), which makes it "unlawful for any person, firm, association, or corporation to sell or exchange, or offer to sell or exchange, for more than the price stated thereon or for remuneration in any form greater than such price, any ticket or tickets for admission to a public amusement, athletic, educational, or other event in the City of Baltimore." As plaintiff sees it, not only does Ticketmaster violate this ordinance, the Lyric does too: the Lyric receives from Ticketmaster portions of the service charges in the form of so-called "rebates," thereby receiving "remuneration in any form greater" than the price stated on the ticket. Plaintiff argues that the exception to liability contained in § 55-1(b) does not apply, because that exception only permits collection of "the excess sum which is permitted to be charged for certain tickets by a person engaged in the business of selling tickets under the provisions of Article 15, Subtitle 21," and defendants are not licensed under Subtitle 21 so as to be able to collect the authorized 50¢ service charge (which the service charges they collect exceed in any event).

In sum, plaintiff construes Baltimore City's statutory scheme as follows: licensed exhibitors and their agents authorized in writing may sell tickets to events, but only at the established price printed on the ticket. Such an authorized agent need not be licensed. However,

a duly licensed ticket agency is permitted to collect a service charge of up to 50¢ per ticket. Aside from the imposition of a maximum 50¢ service charge by a licensed ticket agency, it is, according to plaintiff, unlawful for anyone (including an exhibitor or its authorized agent) to sell a ticket for more than the established price printed on the ticket.

Defendants take a much different view of the ordinances. They argue that Ticketmaster is an agent of the Lyric, duly authorized, in writing, to make original sales of tickets on the Lyric's behalf at the established price printed on the tickets. Therefore, Ticketmaster claims that it comes within the exception to licensure provided by § 21-1(b). This is so, they reason, because Ticketmaster is authorized to, and does, sell the tickets at the established price, albeit with the addition of service charges. The maximum service charge limit of 50¢ does not apply to Ticketmaster, as defendants see it, because that limit only applies to a "licensee under this section" (*i.e.*, Article 15, § 21-2), and Ticketmaster is neither licensed nor required to be licensed as a ticket agency, by virtue of the § 21-1(b) exception.

With respect to Article 19, § 55-1, defendants look to the heading of the ordinance, which is "Ticket Scalping." In defendants' view, the prohibition contained in § 55-1(a) applies only to "ticket scalping" as that phrase is commonly understood, *i.e.*, *resales* of tickets above their original price, and does not apply to original sales of tickets conducted by an exhibitor or the exhibitor's agent. Moreover, even if § 55-1(a) otherwise would apply, defendants argue that they are entitled to the exception from liability contained in § 55-1(b), which allows collection of the "excess sum" that is "permitted to be charged for certain tickets by a person engaged in the business of selling tickets under the provisions of Article 15, Subtitle 21." As noted, defendants contend that Ticketmaster's service charges qualify as such "excess sum[s]" permitted to be

charged under Subtitle 21, because Ticketmaster is the Lyric's authorized agent for ticket sales and (given that Ticketmaster is not licensed or required to be licensed under Subtitle 21) is not subject to the 50¢ maximum service charge limitation.

In essence, defendants construe the ordinances only to apply to ticket resellers, not to exhibitors or the authorized agents of exhibitors. Professional ticket resellers must be licensed, in which case they may collect a per-ticket service charge of up to 50¢. Otherwise, a charge above the established price of a ticket may not be charged by a reseller. But, in defendants' view, the ordinances impose no limitation on the amount of service charges that exhibitors or their authorized agents may collect.

As noted, defendants also dispute plaintiff's authority to recover for any violations of the ordinances, arguing that they do not create a private right of action. And, they dispute the viability of plaintiff's cause of action for money had and received.

## B. Certification

Under Maryland's Certification Act, this court may certify to the Maryland Court of Appeals a question of law "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling [Maryland] appellate decision, constitutional provision, or statute . . . ." C.J. § 12-603. The purpose of the Certification Act "is 'to promote the *widest possible use* of the certification process in order to promote judicial economy and the proper application of [Maryland]'s law in a foreign forum.'" *Proctor v. WMATA*, 412 Md. 691, 705, 990 A.2d 1048, 1056 (2010) (citation omitted) (emphasis in *Proctor*).

The Fourth Circuit has endorsed certification of substantial, unresolved questions of state law to a state's highest court, where a certification procedure is available and resolution of the

questions is necessary to the case, because certification "ensur[es] the correct legal outcome, aid[s] in judicial economy, and manifest[s] proper respect for federalism." *Sartin v. Macik*, 535 F.3d 284, 291 n.6 (4th Cir. 2008). The role of a federal court when considering an issue of state law is to "interpret the law as it believes that state's highest court of appeals would rule." *Abadian v. Lee*, 117 F. Supp. 2d 481, 485 (D. Md. 2000) (citing *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir.), *cert. denied*, 506 U.S. 824 (1992)); *accord Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002) (stating that federal court's task in considering an issue of state law is to "predict how [the state's highest] court would rule if presented with the issue"). Thus, a federal court ordinarily cannot speak with precedential authority on a matter of *state* law. In several procedural contexts, the Supreme Court has invoked the principles of federalism and comity, stating: "Needless decisions of state law [by federal courts] should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

To be sure, "[c]ertification does not constitute 'a panacea for resolution of those complex or difficult state law questions which have not been answered by the highest court of the state.'" *Swearingen v. Owens-Corning Fiberglas Corp.*, 968 F.2d 559, 564 (5th Cir. 1992). The decision to certify a question is not taken lightly. In this case, however, I view certification of the interpretation of the Baltimore City ordinances as appropriate for three reasons: the lack of prior guidance from the Maryland courts; the substantial room for debate as to the issues; and the potentially far-reaching impact of their resolution. As I see it, the combination of these factors suggests that the issues are worthy of a definitive resolution from Maryland's highest court.

As to the first point, the parties agree that there is no reported Maryland appellate decision discussing these ordinances or any analogous legislation. Nor have I uncovered any Maryland cases that are on point.

As to the second point, there is merit to each side's interpretation of the ordinances. Plaintiff's interpretation appears to be grounded in the plain text of the ordinances. Yet, defendants' position is not without textual support.

The Maryland Court of Appeals has articulated on many occasions the principles of statutory interpretation. In *Downes v. Downes*, 388 Md. 561, 571, 880 A.2d 343, 349 (2005), for example, the Court said:

> We have stated the controlling principles of statutory construction so often that only the briefest exposition is necessary. Our predominant mission is to ascertain and implement the legislative intent, which is to be derived, if possible, from the language of the statute ... itself. If the language is clear and unambiguous, our search for legislative intent ends and we apply the language as written and in a commonsense manner. We do not add words or ignore those that are there. If there is any ambiguity, we may then seek to fathom the legislative intent by looking at legislative history and applying the most relevant of the various canons that courts have created.

This case concerns local ordinances, rather than a state statute. But, interpretation of local laws and ordinances is governed by the same principles that apply to state statutes. *See F.D.R. Srour P'ship v. Montgomery County*, 407 Md. 233, 245, 964 A.2d 650, 656 (2009); *O'Connor v. Baltimore County*, 382 Md. 102, 113, 854 A.2d 1191, 1198 (2004).

In construing legislation, Maryland courts seek to "avoid unreasonable or illogical results that defy common sense." *Adamson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 252, 753 A.2d 501, 508 (2000). Defendants' position has some common-sense appeal. Although the text of the statutes does not expressly distinguish between original sales and resales, defendants have

submitted legislative history regarding the ordinances that is at least suggestive of an intent that
the ordinances apply only to ticket resales.

Moreover, the caption of Article 19, § 55-1 refers to ticket "scalping," which ordinarily is
associated with resale. *See, e.g.*, BLACK'S LAW DICTIONARY at 1462 (9th ed. 2009) (defining a
"scalper" as a "seller who buys something (esp. a ticket) at face value (or less) and then tries to
resell it for a higher price"). Of course, Maryland courts ordinarily "'look to the words of the
statute itself, not a caption'" to divine meaning, following the maxim that "[c]aptions and
headings are mere catchwords and can never be taken to limit or expand the plain meaning of the
statutory language.'" *State v. Holton*, 420 Md. 530, 539, 24 A.3d 678, 683 (2011) (citation and
emphasis omitted). However, because this maxim is mandated by the Maryland Code in regard
to the interpretation of state statutes, *see* Md. Code Ann. (1957, 2011 Repl. Vol.), Art. 1, § 18, it
may not have the same force with reference to local ordinances. And, even as to state statutes,
the title of an enactment may be consulted to resolve ambiguity, or when the title was a part of
the enacted legislation, as opposed to a later addition by a publisher or revisor. *See, e.g.*, *BEKA
Indus., Inc. v. Worcester County Bd. of Educ.*, 419 Md. 194, 217-18, 18 A.3d 890, 905 (2011)
("'[I]f the true legislative intent cannot readily be determined from the statutory language alone,
we look to other indicia of that intent, including the title to the bill . . . .'") (citation omitted);
*Morris v. Prince George's County*, 319 Md. 597, 607 n.4, 573 A.2d 1346, 1350 n.4 (1990)
(stating that the caption of a statute may be consulted "when the General Assembly has itself
included the caption in the enacted bill").

As for the third basis for my decision to certify, I am mindful that resolution of these
legal issues may have broad impact. If plaintiff's proposed class is certified, the case has the

potential to resolve the legality under the Baltimore City ordinances of all service charges Ticketmaster has collected from virtually every person who has purchased a ticket to an event in Baltimore using Ticketmaster's system during the limitations period.   But, even if Mr. Bourgeois's claim is the only one that is formally adjudicated, the decision will represent the only extant case construing the ordinances, and may substantially affect Ticketmaster's business practices in Baltimore.  Furthermore, the resolution of these legal issues will be of vital interest to many parties not before the court, including other venues and promoters whose tickets are sold by Ticketmaster, other establishments that serve as Ticketmaster sales outlets, other businesses (both national and local) that sell tickets to events in Baltimore, and members of the ticket-buying public.

On my own initiative, I have also decided to certify the question as to the viability of plaintiff's cause of action for money had and received.  The common law cause of action for money had and received is, in some respects, a relic of Maryland's bygone days of writ pleading (specifically, it was a variety of the writ of assumpsit, which is now often considered to be subsumed within the restitutionary doctrine of unjust enrichment).  *See generally Alternatives Unlimited, Inc. v. New Balt. City Bd. of Sch. Comm'rs*, 155 Md. App. 415, 453-82, 843 A.2d 252, 275-291 (2004).  Several recent appellate decisions seemed to recognize, albeit in *dicta*, the potential continued vitality of such a cause of action.  *See Carter v. Huntington Title & Escrow, LLC*, 420 Md. 605, 24 A.3d 722 (2011); *Benson v. State*, 389 Md. 615, 651-53, 887 A.2d 525, 546-47 (2005); *Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 632 n.11 & 636 & 646-47, 805 A.2d 1061, 1077 n.11 & 1080-81 & 1086 (2002); *see also Arthur v. Ticor Title Ins. Co.*, 569 F.3d 154, 160-62 (4th Cir. 2009).  Yet, I am unaware of any recent Maryland case squarely

holding that such a cause of action can be maintained.[8]

Further, it is unclear how a cause of action for money had and received, based on charges that are legislatively barred, is affected by Maryland jurisprudence regarding implied private rights of action. *See Erie Ins. Co. v. Chops*, 322 Md. 79, 585 A.2d 232 (1991) (adopting four-factor analysis for implication of private right of action from *Cort v. Ash*, 422 U.S. 66 (1975)). This is especially so given that the legislative provisions at issue here are not state statutes but are Baltimore City ordinances; the Court of Appeals has held that Maryland counties (including Baltimore City) ordinarily lack the power to create private rights of action. *See McCrory Corp. v. Fowler*, 319 Md. 12, 20, 470 A.2d 834, 838 (1990) ("In Maryland, the creation of new causes of action in the courts has traditionally been done either by the General Assembly or by [the Maryland Court of Appeals] under its authority to modify the common law of this State."); *see*

---

[8] In *Benson*, the Court said that a "money had and received count *may* lie" to recover sums collected in violation of a statute, but held that the statute at issue had not been violated. *Benson*, 389 Md. at 653, 887 A.2d at 547 (emphasis added). The courts in *Carter* and *Arthur* rejected the plaintiffs' money had and received claims, which sought recovery of sums allegedly charged in violation of the Insurance Article of the Maryland Code, because the courts held that such claims came within the primary jurisdiction of the Maryland Insurance Administration. The courts seemed to assume that, but for the agency's primary jurisdiction, a money had and received claim might lie. Therefore, it is notable that there does not appear to be an administrative claim procedure under the Baltimore City ordinances at issue here. Indeed, although violations of the ordinances are misdemeanor criminal offenses, *see* Baltimore City Code, Art. 15, § 21-5; *id.*, Art. 19, § 55-1(c)(1), and may also be punishable by civil citation, *see id.*, Art. 19, § 55-1(b-1)(1), the ordinances expressly state that the "issuance of a civil citation to enforce this section does not preclude pursuing any other civil or criminal remedy or enforcement action authorized by law." *Id.*, Art. 19, § 55-1(b-1)(2).

It is also noteworthy that the *Carter* Court expressly characterized as *dicta* its discussion in footnote 11 of *Dua* regarding recognition of claims for money had and received as common law causes of action independent of a statutory cause of action. *See Carter*, 420 Md. at 630-32, 24 A.3d at 737-38. However, the discussion in *Carter* came in the context of holding that a circuit court could not entertain a money had and received claim where an administrative agency had primary jurisdiction. The *Carter* Court did not necessarily reject the viability of a money had and received claim where administrative law principles did not apply.

*also Edwards Sys. Tech. v. Corbin*, 379 Md. 278, 287-94, 841 A.2d 845, 851-55 (2004)

(discussing *McCrory*); *H.P. White Lab., Inc. v. Blackburn*, 372 Md. 160, 167-71 812 A.2d 305,

309-11 (2002) (same); *Baker v. Montgomery County*, 201 Md. App. 642, 30 A.3d 267 (2011)

(discussing implication of private rights of action), *cert. granted*, 425 Md. 227, 40 A.3d 39

(2012); *Shabazz v. Bob Evans Farms, Inc.*, 163 Md. App. 602, 636-37, 881 A.2d 1212, 1232

(discussing *McCrory*), *cert. denied*, 390 Md. 92, 887 A.2d 656 (2005).

For all of the foregoing reasons, this court finds that certification is appropriate, and

respectfully requests the controlling opinion of the Maryland Court of Appeals in answer to the

questions certified.  This court recognizes that the Maryland Court of Appeals may reformulate

the questions.  Pursuant to Maryland Rule 8-305(b), plaintiff shall be treated as the appellant in

the certification proceeding.

### IV.  Names and Addresses of Counsel of Record

> Martin E. Wolf
> Richard S. Gordon
> Benjamin H. Carney
> GORDON AND WOLF, CHARTERED
> 102 W. Pennsylvania Avenue, Suite 402
> Towson, Maryland 21204
>
> *Counsel for Plaintiff Andre Bourgeois*

> Robert J. Mathias
> James D. Mathias
> Melissa R. Roth
> DLA PIPER LLP (US)
> 6225 Smith Avenue
> Baltimore, Maryland 21209
>
> *Counsel for Defendant Live Nation Entertainment, Inc.*

Patrick J. Carome
Brent R. Bickley
WILMER, CUTLER, PICKERING, HALE & DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006

*Counsel for Defendant Monumental Ticketing Limited Partnership*

Lawrence J. Quinn
Kelly M. Marzullo
TYDINGS & ROSENBERG LLP
100 E. Pratt Street, 26th Floor
Baltimore, Maryland 21202

*Counsel for Defendant Lyric Productions, LLC*

## V. Conclusion

Plaintiff's Motion to Certify Questions of Law to the Court of Appeals of Maryland (ECF 25) is GRANTED. Pursuant to Maryland Rule 8-305(b), the Clerk is directed to TRANSMIT, to the Clerk of the Court of Appeals of Maryland, this Order and its accompanying exhibits, together with seven certified copies thereof, and a check in the amount of Fifty Dollars ($50.00) payable to the "Clerk of the Court of Appeals."

All further proceedings in this action are hereby STAYED, pending receipt of the opinion of the Maryland Court of Appeals. It is further ORDERED that the parties shall submit a joint status report to this court within 28 days after the Maryland Court of Appeals issues its opinion.

Date:   June 11, 2012

Ellen Lipton Hollander
United States District Judge