IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDRE BOURGEOIS,

    *Plaintiff*,

v.

LIVE NATION ENTERTAINMENT,
INC., *et al.*,

    *Defendants*.

Civil Action No. ELH-12-cv-00058

## MEMORANDUM OPINION

Andre Bourgeois, plaintiff, on behalf of himself and a proposed class of others similarly situated, filed suit against Live Nation Entertainment, Inc. ("Live Nation"); its licensee, Monumental Ticketing Limited Partnership ("Monumental") (collectively with Live Nation, "Ticketmaster"); and Lyric Productions, LLC, d/b/a Lyric Opera House (the "Lyric"), defendants.[1]  The Lyric operates the Arthur and Patricia Modell Performing Arts Center.  The litigation is rooted in plaintiff's purchase of a ticket in 2009 through Ticketmaster's website for a concert held at the Lyric; plaintiff was charged $52 for the ticket and an additional $12 in "service charges."

In particular, plaintiff now challenges the legality of Ticketmaster's collection of such "service charges" in connection with its sales of tickets to entertainment events in Baltimore City (hereinafter sometimes referred to as "Baltimore" or the "City").  For events held at the Lyric,

---

[1] Suit was filed in the Circuit Court for Baltimore City.  Defendants timely removed it to federal court on the basis of federal question jurisdiction, supplemental jurisdiction, and diversity jurisdiction under the relaxed "minimal" diversity-of-citizenship requirements of the Class Action Fairness Act.  *See* 28 U.S.C. §§ 1331, 1332(d), 1367, 1441, 1446, 1453.

Ticketmaster remits a portion of the "service charges" to the Lyric, pursuant to a Facility Agreement.[2]

The Complaint contains ten counts. Generally, plaintiff asserts three substantive allegations of wrongdoing. First, plaintiff contends that Ticketmaster's collection of service charges violates two provisions of the Baltimore City Code. Second, plaintiff alleges that Ticketmaster engaged in fraud and/or misrepresentation by falsely representing that the service charges it collected were legal. Third, plaintiff alleges that Ticketmaster engaged in fraud and/or misrepresentation by concealing and/or failing to disclose that it remits to the Lyric a portion of the service charges it collects.

The first four counts, asserted against all defendants, are as follows: (I) "Money Had and Received"; (II) "Negligent Misrepresentation"; (III) "Violation of the Maryland Consumer Protection Act", Md. Code (2005 Repl. Vol., 2011 Supp.), §§ 13-101 *et seq.* of the Commercial Law Article ("C.L."); and (IV) "Deceit by Non-Disclosure or Concealment". The other six counts allege claims against various combinations of the defendants for violations of several provisions of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*[3] In particular, Bourgeois alleges that Ticketmaster represented that the $12 fee it charged Bourgeois was for its services when, in reality, a portion of that $12 was "secretly" remitted to the Lyric as an undisclosed "kickback."

---

[2] Plaintiff uses the term "service charges," but defendants maintain that the fees were enumerated on the Ticketmaster website as consisting of a "processing fee," a "convenience fee," and a "delivery fee." ECF 60-3 at 5. The Facility Agreement refers to the charges as "service charges." For convenience, I will refer to the charges collectively as "service charges."

[3] The Complaint does not contain a "Count V." Therefore, the latter six counts are erroneously numbered Counts VI through XI.

Initially, each defendant moved to dismiss for failure to state a claim, *see* ECF 18, 19, 21, while plaintiff moved to certify questions of law to the Maryland Court of Appeals. ECF 25. All of the motions were fully briefed. *See* ECF 24, 30, 33, 34, 39. Because plaintiff alleged that defendants had violated two Baltimore City ordinances that had not been interpreted by the Maryland appellate courts prior to plaintiff's suit, I certified several questions to the Maryland Court of Appeals. ECF 53. In an opinion of January 18, 2013, the court answered those questions. *See Bourgeois v. Live Nation Entm't, Inc.*, 430 Md. 14, 17, 59 A.3d 509, 511 (2013).[4]

Thereafter, defendants filed a joint, second Motion to Dismiss ("Motion," ECF 60), along with a Memorandum ("Memo," ECF 60-3), and exhibits. Plaintiff opposes the Motion ("Opp.," ECF 63), and has also filed exhibits.[5] No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons set forth below, I will deny the Motion as to Count I and will grant the Motion as to Counts II–XI.

### Factual Summary[6]

Ticketmaster operates a nationwide ticket business through which it conducts original ticket sales to events on behalf of performance venues and promoters, pursuant to written

---

[4] Judge Alan Wilner, who retired from the Court of Appeals in 2007, was specially assigned to the panel in *Bourgeois* and authored the opinion for a unanimous court.

[5] I have also considered defendants reply ("Reply," ECF 68), plaintiff's "Supplemental Authority in Further Support of Plaintiff's Opposition to Defendants' Motions to Dismiss" (ECF 69), and defendants' "Response to Plaintiff's Supplemental Authority Concerning Motion to Dismiss" (ECF 70).

[6] The facts are drawn primarily from plaintiff's Complaint and from the facts set forth by the Maryland Court of Appeals. Defendants do not concede the truth of the facts alleged in the Complaint. But, I have assumed the truth of the factual allegations, in light of the procedural posture of the case. *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) ("When ruling on a Rule 12(b)(6) motion to dismiss, 'a judge must accept as true all of the factual allegations contained in the complaint,' [and] 'draw all reasonable inferences in favor of the plaintiff.'" (citations omitted)).

agreements with the venues and promoters. The ticket sales relevant to this lawsuit are Ticketmaster's ticket sales to events in Baltimore City, including events at the Lyric, which operates a theater for live performances in Baltimore City.[7]

The Lyric and Ticketmaster are parties to an agreement ("Facility Agreement," ECF 18-7) under which Ticketmaster has the exclusive right to sell tickets by telephone or over the internet to events held at the Lyric (except for performances of the Baltimore Opera). Compl. ¶¶ 6–8. Although the Lyric retains the exclusive right to sell tickets in person at the Lyric's box office, it utilizes Ticketmaster's ticketing system to conduct such sales. *See* Facility Agreement.

In addition to the "face value" price charged for each ticket purchased by telephone or over the internet, Ticketmaster assesses what plaintiff refers to as "service charges." *Id.* ¶ 13. Pursuant to the Facility Agreement, the amount of the service charges is set by Ticketmaster.

---

[7] As noted, "Ticketmaster" refers here collectively to Live Nation and Monumental. The history of the relationship between Live Nation and Monumental and their predecessors in interest is set forth in Live Nation's memorandum in support of its first motion to dismiss (ECF 19-3) and in the joint defense motion to dismiss. *See* ECF 60-3 at 13 n.1. In somewhat simplified terms, from 1991 until January 2011, Monumental was known as Ticketmaster Group Limited Partnership. During that period, Monumental was a licensee of Ticketmaster Entertainment, LLC ("Ticketmaster Entertainment"), a national ticket sales business. Under the licensing agreement, Monumental held the exclusive right to conduct sales of tickets to events in Maryland, Virginia, and the District of Columbia using Ticketmaster Entertainment's ticket sales and distribution system and service marks (including the Ticketmaster website, www.ticketmaster.com). This licensing arrangement was unique; elsewhere in the country, Ticketmaster Entertainment contracted directly with venues and promoters to sell tickets on their behalf as their ticketing agent.

In January 2010, Live Nation acquired Ticketmaster Entertainment. Live Nation is incorporated in Delaware, with its principal place of business in California. In January 2011, Live Nation purchased all of the assets of Monumental, ending the licensing arrangement. In connection with the asset sale, Monumental changed its name from Ticketmaster Group Limited Partnership to Monumental Ticketing Limited Partnership, a Maryland limited partnership. Since the asset sale, Live Nation, through its now-wholly-owned subsidiary, Ticketmaster Entertainment, has conducted sales of tickets in Maryland, Virginia, and the District of Columbia using the Ticketmaster system and marks. Monumental is no longer engaged in any ongoing business.

For each ticket to a Lyric event sold by telephone or over the internet, Ticketmaster remits the entire face value of the ticket to the Lyric, along with a portion of the service charges.[8] The remitted portion of the service charges is characterized in the Facility Agreement as a "rebate"; plaintiff characterizes it as a "kickback." *Id.* ¶¶ 14, 28, 46.[9]

Bourgeois purchased a ticket from Ticketmaster to a concert by the singer-songwriter Jackson Browne, which was held at the Lyric on November 9, 2009. *Id.* ¶ 40. Bourgeois bought the ticket over the internet, using Ticketmaster's website (www.ticketmaster.com). *Id.* The face value of the ticket—the price that Bourgeois alleges was publicly advertised and that was printed on the ticket—was $52. *Id.* ¶ 41. However, Bourgeois was also charged more than $12 in what he refers to as "service charges." *Id.* ¶ 42. The amount of the service charges was disclosed to Bourgeois during the purchase process, before he agreed to purchase the ticket. The $52 face value of the ticket, along with a portion of the service charges, allegedly was remitted by Ticketmaster to the Lyric. *Id.* ¶ 43.

Bourgeois alleges that the collection of these service charges by the Lyric and/or by Ticketmaster violates Article 15, Subtitle 21 (the "Licensing Ordinance") and Article 19, Subtitle 55 (the "Police Ordinance") of the Baltimore City Code (collectively, the "Ordinances"). The text of the Ordinances is as follows:

---

[8] Tickets sold at the Lyric's physical box office are subject to a different arrangement. Although the "Lyric does not collect a Ticketmaster service charge for tickets sold at its box office for its own events," it does collect "a 'facility fee' of up to three dollars that is not reflected in the price printed on the ticket." *Bourgeois*, 430 Md. at 23–24, 59 A.3d at 514.

[9] Defendants aver here, as they did before the Maryland Court of Appeals, that this sort of arrangement is common in Ticketmaster contracts, including those with venues in Baltimore City that are owned and operated by agencies of the State of Maryland and the City of Baltimore.

## § 21-1. License required.

(a) *In general.*

No person shall engage in the business of selling the tickets, cards, or other tokens evidencing the right of admission to exhibitions, performances, games, or sports conducted by licensees under licenses issued by the State of Maryland or [the] City of Baltimore, or shall open or conduct an office, agency, or other place by whatever name known at which such tickets are sold or offered for sale, unless a license shall have been issued to such persons by the Director of Finance upon the payment of the fee herein prescribed.

(b) *Exception.*

Provided, however, that no license shall be required of any agent duly authorized in writing by a licensed exhibitor to sell tickets for said licensee at the established price printed thereon.

(c) *Scope; term; fee.*

(1) Each such license shall be limited to a single location or place of business and shall expire on January 1 next ensuing the grant thereof.

(2) The fee for such a license shall be $250 and the said license fee shall not be prorated.

## § 21-2. Maximum service charge.

A licensee under this section, or any officer or employee thereof, shall not directly or indirectly exact, accept, or receive for any ticket or token of admission to an exhibition, performance, game, or sport conducted by a licensee under a license granted by the State of Maryland, or the City of Baltimore, any greater amount than 50¢ in excess of the sum of the regular or established price or charge therefor printed on the face of such ticket, plus the amount of any tax imposed by the Government of the United States or by the State of Maryland upon such ticket or the right of admission thereunder.

## § 21-3. "Scalping" prohibited.

(a) *Price to be on ticket.*

Wherever the right of admission to any licensed exhibition or performance or to any game or sport where a charge is made is evidenced by a ticket, card, or other token, the regular or established price or charge therefor shall be conspicuously printed thereon.

(b) *Sale for more prohibited; penalties.*

(1) If such licensee, or any of his officers or employees, shall extract, accept, or receive, directly or indirectly, any greater amount than such regular or established price or charge, plus the amount of any tax imposed by the Government of the United States or the State of Maryland:

(i) the license of such licensee may be revoked and annulled; and

(ii) such licensee, officer, or employees shall be guilty of a misdemeanor and, upon conviction thereof, shall be subject to a fine of not more than $500 for each such violation.

(2) The sale of each ticket in violation thereof shall constitute a separate offense.

## § 21-4. Revocation of licenses.

The license of any licensee under this subtitle may be revoked and annulled by the Director of Finance for any violation of this subtitle.

## § 21-5. Penalties for operating without license.

Any person who shall engage in any business or conduct an office, agency, or other place for which a license is required by this subtitle, without procuring such license, shall be guilty of a misdemeanor and, upon conviction thereof, be subject to a fine of not more than $500 and to imprisonment for not more than 6 months, or both, in the discretion of the Court.

\* \* \*

## ARTICLE 19
## POLICE ORDINANCES
\* \* \*
## SUBTITLE 55
## TICKET SALES

## § 55-1. Ticket scalping.

(a) *Prohibited conduct.*

It shall be unlawful for any person, firm, association, or corporation to sell or exchange, or offer to sell or exchange, for more than the price stated

thereon or for remuneration in any form greater than such price, any ticket or tickets for admission to a public amusement, athletic, educational, or other event in the City of Baltimore.

(b) *Exception.*

Nothing in this section shall be construed to make illegal or invalidate the excess sum which is permitted to be charged for certain tickets by a person engaged in the business of selling tickets under the provisions of Article 15, Subtitle 21{"Ticket Agencies"} of the City Code.

(b-1) *Enforcement by citation.*

(1) In addition to any other civil or criminal remedy or enforcement procedure, this section may be enforced by issuance of a civil citation under City Code Article 1, Subtitle 41 {"Civil Citations"}.

(2) The issuance of a civil citation to enforce this section does not preclude pursuing any other civil or criminal remedy or enforcement action authorized by law.

(c) *Penalties.*

(1) A violation of the provisions of this section shall be deemed to be a misdemeanor and, upon conviction thereof, shall be subject to a fine of not more than $1,000.

(2) The sale or exchange of, or offer to sell or exchange, each ticket in violation of the provisions of this section shall be treated as a separate offense.

\*     \*     \*

As noted, I certified several questions to the Maryland Court of Appeals. In its opinion, 430 Md. 14, 59 A.3d 509, the court summarized the history of each ordinance. With regard to the Licensing Ordinance, the Maryland Court of Appeals explained, *id.*, 430 Md. at 29–32, 59 A.3d at 517–19 (emphasis in original):

What are now §§ 21-1 through 21-5 were first enacted in June 1949 by Ordinance 49-735, which added a new § 18A to Article 25 of the then-current 1927 City Code. . . .

It established broader regulation of both exhibitors and ticket agencies, provided for the licensing of the latter, and permitted licensed ticket agencies to add a premium of 50¢ on the sale of tickets. . . .

Subsection 18A(a) dealt exclusively with exhibitors who conducted licensed events and contained the language now found in § 21-3. It required exhibitors who issued tickets of admission to "any licensed exhibition or performance or to any game or sport" to print the established price or charge on the ticket and prohibited *the exhibitor* and *its* employees from charging or receiving any greater amount for the ticket, other than amounts for State or Federal taxes. . . .

Section 18A(b) dealt with ticket [agencies] – persons engaged in the business of selling tickets to events conducted by licensed exhibitors. . . . [I]n the same language now contained in §§ 21-1(a), 21-2, 21-4, and 21-5, it required . . . persons engaging in the business of selling tickets to such licensed events to have a ticket agency license issued by the City Treasurer, prohibited those licensees from charging more than 50¢ over the established price, and provided both criminal penalties and for the revocation of "any license under this section" for a violation. . . .

As the description makes clear, the Licensing Ordinance established a two-part regulatory scheme governing two distinct licensed entities: § 21-3 (the "Exhibitor Provision") regulates licensed exhibitors and their authorized agents who sell tickets to their own licensed Baltimore events; §§ 21-2, 21-4, and 21-5 regulate ticket agencies licensed under § 21-1 who sell tickets to licensed Baltimore events conducted by exhibitors. *See id.*, 430 Md. at 19, 33–34, 59 A.3d at 512, 520.[10] Ticketmaster falls in the first category: it is a duly authorized agent of the Lyric, an exhibitor. And, under basic principles of agency law, Ticketmaster is governed by § 21-3 and not §§ 21-2, 21-4, or 21-5, which apply only to licensed ticket agencies.[11] *See id.* at 40, 59 A.3d at 524.

_____

[10] The Maryland Court of Appeals observed that "the 2000 edition of the Code muddled somewhat that clear distinction through its structural reorganization of those provisions – placing § 21-3, which applied only to exhibitors, in the middle of provisions dealing with ticket agencies – although the legislative history source notes following the current provisions do make their origin clear." *Bourgeois*, 430 Md. at 34, 59 A.3d at 520.

[11] To be clear, this case involves two sorts of "agents." I use the term "agent" or "duly authorized agent" to refer to entities, like Ticketmaster, that are in a principal/agent relationship

With regard to the Police Ordinance, which was first enacted in 1958, the Maryland Court of Appeals explained, *Bourgeois*, 430 Md. at 42, 59 A.3d at 525:

> Unlike the 1949 ordinance [*i.e.* § 21], this one was aimed exclusively at scalping. It repealed the 1948 ordinance directed only at tickets to football games, which had remained in the Code despite the injunction against its enforcement, and replaced it with a broader prohibition against any person, firm, association, or corporation selling or exchanging or offering to sell or exchange tickets to any public amusement, athletic, educational, or other event in Baltimore "for more than the price stated thereon or for remuneration in any form greater than such price." In an effort to create harmony with the 1949 licensing law, however, the ordinance provided that it was not to be construed as making illegal or invalidating "the excess sum which is permitted to be charged for certain tickets by a person engaged in the business of selling tickets under the provisions of Section 21 of Article 19 of the Code."

After detailing the interesting histories of the Ordinances, *Bourgeois*, 430 Md. at 29–34, 59 A.3d at 517–520, the Maryland Court of Appeals answered the certified questions. The certified questions, along with the answers provided by the Court of Appeals, are as follows, *Bourgeois*, 430 Md. at 24–25, 41, 44, 45, 51, 59 A.3d at 515, 525–527, 530:

> 1. **Question**: "Where a ticket agency is authorized in writing by a licensed exhibitor to sell tickets to an event, and the ticket agency collects both the established price printed on the ticket and an additional, separately-stated per-ticket service charge that would not be charged as part of the established ticket

---

with an exhibitor and therefore exempted by § 21-1(b) from the licensing requirement. The rules applicable to exhibitors in § 21-3 also apply to their duly authorized agents. *See id.*; *Homa v. Friendly Mobile Manor, Inc.*, 93 Md. App. 337, 359, 612 A.2d 322, 333 (1992) ("The authority of an agent must come from the principal . . . ."). I use the term "ticket agencies" in reference to entities licensed under § 21-1(a) to engage in the business of selling tickets. These entities are subject to the strictures of §§ 21-2, 21-4, and 21-5.

Defendants suggest that § 21-3(b) "does not regulate the conduct of an exhibitor's 'agents'" because § 21-1(b) "expressly addresses requirements applicable to a licensee's 'agent.'" Reply at 3. I disagree. Section 21-1(b) does not address requirements applicable to a licensee's agent. Rather, § 21-1(b) exempts an *exhibitor's* agent from the licensing requirements of § 21-1(a), but it does not free an exhibitor's agent from legal restraints. On the contrary, it is subject to the same restraints as is its principal. *See Bourgeois*, 430 Md. at 38, 59 A.3d at 523 ("Lyric may not *validly, lawfully* authorize Ticketmaster, or anyone else, to sell tickets for more than the established price." (emphasis in original)).

price when tickets are sold directly by the exhibitor, does the exception contained in Article 15, § 21-1(b) of the Baltimore City Code apply, so as to exempt the ticket agency from the requirement of licensure, *see id.* § 21-1(a), and from the limitation of maximum service charges, *see id.* § 21-2?"

**Answer**: "If a ticket agency is authorized in writing by a licensed exhibitor to sell tickets as an agent of the exhibitor, the ticket agency is not required to be licensed under Art. 15, § 21-1 of the Baltimore City Code by reason of exercising that authority. A purported authorization by the exhibitor to charge more than the established price for the tickets is invalid and does not limit or expand the exception in § 21-1(b)."

2. **Question**: "Does Article 19, § 55-1(a) of the Baltimore City Code prohibit the collection of a service charge, in addition to the established price printed on a ticket in connection with the original sale of the ticket by the exhibitor or the exhibitor's authorized agent? Or, instead, does § 55-1(a) apply only to ticket resales?"

**Answer**: "Article 19, § 55-1(a) of the Baltimore City Code is not limited to ticket resales. Except as permitted in § 55-1(b), it prohibits the collection of a service charge, in addition to the price printed on the ticket, in connection with the original sale of the ticket by the exhibitor or the exhibitor's authorized agent."

3. **Question**: "If Article 19, § 55-1(a) applies to original ticket sales, does the exception contained in § 55-1(b) apply, so as to allow a seller of tickets to charge a per-ticket service charge in addition to the established price printed on the ticket, where the seller is not licensed under Article 15, § 21-1(a), and the service charge exceeds the maximum service charge permitted under § 21-2, but the seller is exempt from licensure under § 21-1(b)?"

**Answer**: "Art. 19, § 55-1(a) of the Baltimore City Code does not permit anyone other than a ticket agency licensed under Art. 15, § 21-1 to collect anything more for a ticket than the established price printed on the ticket plus applicable state or federal taxes. Included in that prohibition is a ticket agency exempt from licensure under Art. 15, § 21-1(b). Section 55-1(b) does permit a ticket agency licensed under Art. 15, § 21-1 to collect an additional 50¢ per ticket."

4. **Question**: "Does Maryland recognize a common-law cause of action for money had and received and, if so, may a claim for money had and received be maintained to recover money collected in violation of the above-referenced Baltimore City ordinances?"

**Answer**: "Maryland continues to recognize an action for money had and received. Unless otherwise precluded by statute, such an action will lie to recover money paid in excess of that allowed by statute, including the Baltimore city ordinances, if the agreement pursuant to which it was paid has not been fully consummated, *i.e.* remains executory. Except with respect to a usurious contract, however, the action does not lie to recover money paid under a fully consummated contract as to which the parties may be regarded as being *in pari delicto*."

To summarize, the Court of Appeals held that Ticketmaster was not required to obtain a license to conduct ticket sales in Baltimore, but was nonetheless prohibited by the Ordinances from charging any amount greater than the face value of the tickets it sold. Although §§ 21-2 and 55-1(b) permit a "ticket agency" licensed under Art. 15, § 21-1 to collect an additional 50¢ per ticket, the court ruled that Ticketmaster was not such a licensed ticket agency and therefore was not permitted to charge even a 50¢ fee. See *Bourgeois*, 430 Md. at 41, 59 A.3d at 525. The court further held that a claim for money had and received is viable, with the caveat that it may be barred with respect to a "consummated contract as to which the parties [were] *in pari delicto*."[12]

### Standard of Review

A motion pursuant to Rule 12(b)(6) constitutes an assertion by a defendant that, even if the facts alleged by the plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Whether a complaint states a claim for relief is assessed by

---

[12] After the Maryland Court of Appeals issued its decision in *Bourgeois*, the Baltimore City Council temporarily suspended the Ordinances. *See* Ticket Agencies – Temporary Modification, Enactment No. 13-108 (Mar. 15, 2013), http://legistar.baltimorecitycouncil.com/detailreport/?key=5774. Thereafter, the Baltimore City Council passed City Ordinance 13-157, which went into effect on September 18, 2013, and repealed Article 15, Subtitle 21 and Article 19, Subtitle 55. It replaced the repealed subtitles with a new Article 2, Subtitle 16, titled "Ticket Sales". Article 2, Subtitle 16 permits entities like Ticketmaster to impose service charges on their ticket sales, subject to several disclosure requirements. It does not include a limit on the amount of service charges that entities like Ticketmaster may charge.

reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 n.3 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

In order to satisfy Rule 8(a)(2), a plaintiff need not include "detailed factual allegations." *Twombly*, 550 U.S. at 555. But, the rule demands more than bald accusations or mere speculation. *Id.*; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. In other words, the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Iqbal*, 556 U.S. at 684; *Simmons v. United Mortg. and Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

In reviewing such a motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, ____ U.S. ____, 132 S. Ct. 402 (2011); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385–86 (4th Cir. 2009), *cert. denied*, 559 U.S. 992 (2010). However, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Twombly*, 550 U.S. at 555. Similarly, the defendant's motion will be

granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted). Moreover, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe*, 579 F.3d at 385–86.

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy he or she seeks. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1960 (2012). "'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'" *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted); *accord Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201-02 (10th Cir. 2011) ("When reviewing a 12(b)(6) dismissal, 'we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.' Dismissal is appropriate if the law simply affords no relief.") (internal citation omitted).

A motion asserting failure of the complaint to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "This principle only applies, however, if all

facts necessary to the affirmative defense '*clearly appear*[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

The Complaint contains several claims that sound in fraud. These claims implicate the heightened pleading standard under Fed. R. Civ. P. 9(b). *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that a Maryland CPA claim that "sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Under the rule, a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

Rule 9(b) serves several salutary purposes:

> "First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned

after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

Notably, however, Rule 9(b) by its plain text permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, Civ. No. HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)); *accord Gadson v. Supershuttle International*, Civ. No. AW-10-1057, 2011 WL 1231311, at * 9 (D. Md. Mar. 30, 2011).

In resolving a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013). However, in considering a challenge to the adequacy of plaintiff's pleading, the court may properly consider documents "attached or incorporated into the complaint," as well as documents attached to the defense motion, "so long as they are integral to the complaint and authentic." *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also E.I. du Pont de Nemours & Co.*, 637 F.3d at 448. To be "integral," a document must be one "that by its 'very existence, *and not the mere information it*

*contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

Defendants have attached several exhibits to their Motion. They include three documents that purport to set out the contractual relationship between plaintiff and defendants that arose from plaintiff's ticket purchase: "Ticketmaster.com Terms of Use As of June 28, 2009" (ECF 60-4), "Ticketmaster.com Purchase Policy As of June 28, 2009" (ECF 60-5), and "Ticketmaster.com Homepage As of June 28, 2009" (ECF 60-6). These documents are integral to the Complaint, as they arise out of the transaction that forms the basis of plaintiff's suit. And, plaintiff does not dispute their authenticity. Therefore, I will consider the documents in resolving the Motion.

Defendants attached two additional documents: "Excerpts from bill file for City Council Bill No. 08-228" (ECF 60-7) and the "Declaration of Howard Fleming," Director of Product Development at Live Nation (ECF 60-8). Because neither one is integral to the Complaint, I will not consider them.

Additionally, the parties often refer to the "Facility Agreement" between Ticketmaster and the Lyric, which Ticketmaster had attached to its earlier motion to dismiss (ECF 18-7) and which the Maryland Court of Appeals considered in issuing its decision. *See Bourgeois*, 430 Md. at 21, 59 A.3d at 513. This document governs the contractual relationship among the defendants, and its financial terms form the basis of plaintiff's claims that refer to "kickbacks" from Ticketmaster to the Lyric. It is integral to the Complaint and plaintiff has not disputed its authenticity, and so it is properly before the Court.

Defendants seek dismissal of the Complaint on various grounds. The majority of their arguments are directed toward plaintiff's claim for money had and received. As to that cause of action, they argue: (1) the Ordinances do not apply to plaintiff's purchase because his purchase did not take place within Baltimore; (2) even if the Ordinances apply to plaintiff's purchase, the doctrine of *in pari delicto* and other equitable considerations bar plaintiff from recovery; and (3) the voluntary payment doctrine bars plaintiff from recovery. As to the other causes of action, defendants claim that plaintiff's allegations are, for various reasons, insufficient to state claims under state or federal law. I will address each count, in turn.

*Count I: Money Had and Received*

Plaintiff's first cause of action is for money had and received. In *Bourgeois*, 430 Md. at 45, 59 A.3d at 527, the Maryland Court of Appeals explained: "An action for money had and received is one of what have been referred to as the 'common counts' or 'common money counts' that developed under English common law as a branch of the common law writ of assumpsit—*indebitatus assumpsit*." A count for money had and received "'lies whenever the defendant has obtained possession of money which, in equity and good conscience, he ought not to be allowed to retain.'" *Benson v. State,* 389 Md. 615, 652–53, 887 A.2d 525, 547 (2005) (quoting *State, Use of Employment Sec. Bd. v. Rucker,* 211 Md. 153, 126 A.2d 846 (1956)).

The *Bourgeois* Court observed that "the common courts are rarely pled any more," 430 Md. at 46, 59 A.3d at 527, although the court "has never repealed or repudiated them" and has continued to "recognize[] the viability of an action for money had and received." *Id.* at 46, 59 A.3d at 527–28. Indeed, the court said: "An action for money had and received is a well-

established remedy with a long history in this State, and, so long as it continues to have any usefulness, we see no reason to abrogate it." *Id.* at 46, 59 A.3d at 528.

Citing *Poe's Pleading and Practice* ("*Poe's*"), 6th (Sachs) ed. §§ 119–126 (1970),[13] the *Bourgeois* Court explained that the common law claim for "money had and received" has several branches. *Bourgeois*, 430 Md. at 47–48, 59 A.3d 528–29. The court outlined several of those branches, noting that the action may lie to recover money paid "upon a mistake of fact"; "to recover money obtained by fraud or false pretenses"; to obtain money "paid upon an unexecuted illegal contract"; or, "in certain circumstances," to recover money "paid under an executed illegal contract." *Id.*

As to plaintiff's claim, the *Bourgeois* Court stated: "The branch of the action that appears to be the one most on point . . . is that the service charges were paid pursuant to an illegal, and thus allegedly void, agreement." *Id.* at 48, 59 A.3d at 529. The court explained that an action for money had and received "will lie to recover money paid in excess of that allowed by statute, including the Baltimore City ordinances, if the agreement pursuant to which it was paid has not been fully consummated, *i.e.*, remains executory." *Id.* at 51, 59 A.3d at 530–31. But, it cautioned: "If the agreement is fully executed, however, and there are no special circumstances that would preclude a finding that the parties were *in pari delicto*, the action will not lie. The resolution of that issue, at least in part, is a factual matter for the District Court to determine." *Id.*

---

[13] *Poe's* is a frequently cited treatise on pleading and practice in Maryland. *See, e.g.*, *Menefee v. State*, 417 Md. 740, 748, 12 A.3d 153, 158 (2011); *Lohman v. Lohman*, 331 Md. 113, 125, 626 A.2d 384, 390 (1993); *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 315, 389 A.2d 887, 899 (1978); *Merryman v. Wheeler*, 130 Md. 566, 101 A. 551, 552 (1917).

Defendants assert four challenges to plaintiff's claim for money had and received.[14] First, they argue that the Ordinances did not apply to plaintiff's ticket purchase because the purchase did not occur in Baltimore City. Second, they contend that plaintiff may not recover because he and the defendants were *in pari delicto*. Third, they maintain that "other equitable considerations" preclude recovery. Fourth, defendants claim that plaintiff is barred from recovery by the "voluntary payment doctrine." I will address each of these arguments in turn.

### A. *Application of the Ordinances to Plaintiff's Transaction*

Defendants argue that plaintiff's claim for money had and received cannot lie because defendants' online sale of tickets to plaintiff was not governed by the Ordinances; thus, plaintiff did not pay any money in excess of that allowed by statute. Defendants base their position on two precepts: First, according to defendants, the Ordinances do not and legally cannot apply to transactions that occur outside of Baltimore. Second, defendants maintain that ticket sales conducted on an internet website do not take place within Baltimore "because the website is not a location in the city." Memo at 14. On these grounds, defendants conclude that the Ordinances do not apply to plaintiff's purchase, and more broadly, do not apply to Ticketmaster's online sales of tickets to events at the Lyric.

In order to evaluate defendants' first premise, I must determine whether the Ordinances apply to transactions that occur outside of Baltimore. In *Bourgeois*, the Maryland Court of Appeals set forth the well settled "basic rules" for statutory interpretation of an ordinance or statute in Maryland, 430 Md. at 26–27, 59 A.3d at 516 (citations omitted):

> A court's primary goal in construing statutes is to discern the legislative purpose—the ends to be accomplished, the evils to be remedied. The most

---

[14] Plaintiff characterizes defendants' arguments as "defenses."

common expression of that principle is that we look to the intention of the Legislature "in enacting the statute." That, necessarily, has been construed to mean the intent of the Legislature "at the time it enacted the statute." We thus look at the "ends to be accomplished" or the "evils to be remedied" known to, or at least within the reasonable contemplation of, the legislative body when it enacted the statute.

*** 

We begin with the plain language of the statute, reading it as a whole to ensure that no word, clause, sentence, or phrase is rendered meaningless. If the language is clear and unambiguous, we need go no further. In determining whether the language is clear and unambiguous, we interpret each provision in the context of the entire statutory scheme. Statutes must, however, be given a reasonable interpretation, not one that is illogical or incompatible with common sense, and statutes on the same subject are to be read together and harmonized, to the extent possible.

*See Miller v. Matnias,* 428 Md. 419, 450-51, 52 A.3d 53, 72 (2012); *Montgomery County v. FOP Lodge 35,* 427 Md. 561, 572, 50 A. 3d 579, 585-86 (2012); *120 W. Fayette v. Baltimore*, 413 Md. 309, 331, 992 A.2d 459, 472 (2010) (applying to municipal ordinances the same rules of construction that apply for state statutes).

Further, both Maryland courts and federal courts adhere to the proposition that "an interpretation which raises doubts as to a legislative enactment's constitutionality should be avoided if the language of the act permits." *Harryman v. State*, 359 Md. 492, 509, 754 A.2d 1018, 1028 (2000); *accord, e.g.*, *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council,* 485 U.S. 568, 575 (1988).[15] The Maryland Court of Appeals has

---

[15] On the federal side, there are two versions of this so-called "constitutional avoidance" canon. The first, often referred to as the "classical" version of the canon, directs that, "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act." *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J.). In contrast, the "modern" version of the canon posits that courts ought to avoid an interpretation that renders a statute unconstitutional, but also ought to avoid an interpretation that raises "'grave doubts'" about the statute's constitutionality. *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (quoting *United States v. Jin Fuey Moy*, 241 U.S. 394,

long noted: "Ordinarily a statute is not applicable extraterritorially, but only to acts done within the jurisdiction." *State ex rel. Gildar v. Kriss*, 191 Md. 568, 573, 62 A.2d 568, 569 (1948).

Notably, if a statute is susceptible to more than one interpretation, the courts in Maryland may consider "the statute's legislative history, purpose, and structure, as well as the case law." *Bourgois,* 430 Md. at 27, 59 A.3d at 516. In other words, a court may consider legislative history to discern legislative intent. *Id.*

In accordance with the principles set forth above, I must first determine whether the "plain language" of the Ordinances, read "in the context of the entire statutory scheme," makes their geographic reach "clear and unambiguous." If so, I must adopt the clear and unambiguous meaning. On the other hand, if the language of the Ordinances permits multiple interpretations, I may look to legislative intent to glean the meaning. But, if one of these interpretations would raise doubts about the constitutionality of the Ordinances, I must adopt an interpretation that avoids such constitutional doubts. Finally, if the language of the Ordinances permits multiple interpretations, and no interpretation would raise any constitutional doubts, I am free to adopt the reading of the provision dictated by the "basic rules" of statutory interpretation.

I will begin with the Licensing Ordinance. For convenience, I will set forth again, in relevant part, the Exhibitor Provision of the Licensing Ordinance:[16]

### § 21-3. "Scalping" prohibited.

---

401 (1916)). In other words, the classical version avoids declaring a statute unconstitutional, while the modern version avoids raising doubts about a statute's constitutionality. Maryland courts appear to follow the "modern" version of the canon. *See Harryman*, 359 Md. at 509–10, 754 A.2d at 1027–28.

[16] I focus on the Exhibitor Provision because that is the provision of the Licensing Ordinance that applies to defendants, who are an exhibitor and its duly authorized agents.

…

(b) *Sale for more prohibited; penalties.*

    (1) If such licensee, or any of his officers or employees, shall extract, accept, or receive, directly or indirectly, any greater amount than such regular or established price or charge, plus the amount of any tax imposed by the Government of the United States or the State of Maryland:

        (i) the license of such licensee may be revoked and annulled; and

        (ii) such licensee, officer, or employees shall be guilty of a misdemeanor and, upon conviction thereof, shall be subject to a fine of not more than $500 for each such violation.

Bourgeois contends that this provision applies to all "sales by the Lyric, either directly in person . . . or through its exclusive ticket agent Ticketmaster," regardless of where the sales physically take place. According to Bourgeois, such ticket sales are not "extraterritorial" in any relevant sense; they are sales "to events *licensed by Baltimore City* by venues *located in Baltimore City* and ticket agents *for those Baltimore City venues . . . .*" *Id.* at 15 (emphasis in original). According to plaintiff, any other reading would allow an exhibitor to circumvent local laws with impunity by leaving the City limits to conduct its sales. Conversely, defendants urge that the provision applies only to ticket sales consummated "*within the physical limits of Baltimore City.*" Memo at 9 (emphasis in original). In other words, defendants maintain that a licensed exhibitor may freely "scalp" tickets to Baltimore events, so long as the sales are conducted outside the City limits or the sales are conducted over the internet. In their view, any other reading would be unreasonable and would violate the Home Rule Amendment of the Maryland Constitution.

In my view, the Exhibitor Provision is susceptible to both plaintiff's and defendants' proposed interpretations of its geographic scope. However, plaintiff's interpretation would raise

constitutional doubts.  Therefore, I will adopt defendants' interpretation and limit the application of the Exhibitor Provision to ticket sales that take place within Baltimore City.  I explain below.

The plain text of the Exhibitor Provision does not contain a geographic limitation with regard to the place where the licensed exhibitor conducts a particular ticket sale.  Accordingly, as plaintiff posits, § 21-3 could be construed to bar a licensed exhibitor from selling a ticket for a licensed Baltimore event at above face-value, even when the sale takes place outside of Baltimore City, to subject the licensee to revocation of its license under § 21-3(b)(1)(i), and to subject the licensee to criminal prosecution under § 21-3(b)(1)(ii).  Defendants insist that the Court is *compelled* to eschew this literal interpretation based on the absence of a geographic limitation, asserting that the City Council could not have intended such an "extraordinary" scheme that allows the City to "reach beyond its borders."  Reply at 8–9; *cf. United States v. Kirby*, 74 U.S. 482, 486 (1868) ("General terms should be so limited in their application as not to lead to . . . an absurd consequence.").  Plaintiff's interpretation is supported by the plain meaning of the provision and is not facially unreasonable.

The Exhibitor Provision seemingly provides for the revocation of an exhibitor's license, without regard to where the disqualifying conduct takes place.  Despite defendants' argument that this result would be "extraordinary," it is in accord with other licensing schemes in Maryland that impose restrictions on licensees' conduct without regard to the location of that conduct.  For example, Maryland law provides that an individual's commercial driver's license will be revoked for one year if he commits "[a] violation of a federal law or *any other state's* law which is substantially similar in nature" to Maryland's laws prohibiting driving under the influence.  Md. Code (2012 Repl. Vol., 2013 Supp.), § 16-812(a)(2)(ii) of the Transportation

Article (emphasis added).  It cannot be suggested that this law has extraterritorial reach or intrudes on another state's driving laws simply because it attaches consequences in this State based on an applicant's actions in another state.  And, an attorney may be disbarred by the State of Maryland for conduct occurring elsewhere.  *See, e.g.*, *Attorney Grievance Comm'n of Md. v. Richardson*, 350 Md. 354, 365, 712 A.2d 525, 530 (1998).

To be sure, the examples cited above differ from the Exhibitor Provision, in that the extraterritorial acts that trigger license-related consequences in Maryland are typically violations of the laws of other states.  Despite this distinction, the pivotal similarity remains:  The convictions or citations are adjudicated or issued outside of Maryland, and yet Maryland attaches consequences to them.  Moreover, in another respect, the Exhibitor Provision has *less* of an "extraterritorial" flavor than the cited restrictions on driver's licenses and bar membership.  This is because the conduct targeted by the Exhibitor Provision directly impacts the City; the tickets in issue are those being sold are for events taking place in Baltimore.  In contrast, a driving violation in a different state has no immediate impact in Baltimore.

On the other hand, the Exhibitor Provision, read in context, is also susceptible to the implied geographic limitation suggested by defendants.  *See Bourgeois*, 430 Md. at 27, 59 A.3d at 516 (noting that Maryland courts "interpret each provision in the context of the entire statutory scheme.").  A geographic limitation similar to that proposed by defendants is implied in other, similarly worded portions of Article 15 of the Baltimore City Code.  For example, Article 15, § 1-20 provides that "no live adult entertainment may be conducted between the hours of 2 a.m. and noon."  But, it does not expressly limit its application to live adult entertainment conducted within Baltimore.  Similarly, Article 15, § 7-2 provides: "No person shall carry on the business

of an employment agency without first obtaining a license to conduct an employment agency."

However, it does not make explicit that licenses are only required for those wishing to run an

employment agency in Baltimore.  Despite the lack of explicit language limiting these provisions

to operation within Baltimore, it seems fairly obvious that neither applies outside of the City

limits.  Thus, the Exhibitor Provision can also be read to contain an implied geographic

limitation.  Accordingly, I conclude that the language of the provision *permits* the interpretations

proffered by the defendants.

Even if both interpretations are reasonable, defendants urge adoption of their

interpretation because plaintiff's interpretation would render the provision unconstitutional.

Specifically, defendants contend that the Exhibitor Provision, if construed to reach transactions

that occur outside of Baltimore City, would not be a "local law" and thus would violate Article

XI–A of the Maryland State Constitution, known as the Home Rule Amendment.  Memo at 12–

16.  At a minimum, defendants argue, application of the provision to transactions outside of the

City would raise constitutional doubts and therefore must be rejected.

The Home Rule Amendment enables Baltimore City and certain counties in Maryland to

achieve a significant degree of political self-determination, by requiring the General Assembly to

transfer to those localities its power to enact many types of local laws.  *See Piscatelli v. Bd. of

Liquor License Comm'rs*, 378 Md. 623, 633, 837 A.2d 931, 937 (2003); *Tyma v. Montgomery

County*, 369 Md. 497, 504, 801 A.2d 148, 152 (2002); *McCrory Corp. v. Fowler*, 319 Md. at 16,

570 A.2d at 835–36.  Long ago, in *State v. Stewart*, 152 Md. 419, 422, 137 A. 39, 41 (1927), the

Maryland Court of Appeals explained the rationale of the Home Rule Amendment:

> [A] larger measure of home rule [will] be secured to the people of the
> respective political subdivisions of the state in matters of purely local concern, in

order that there should be the fullest measure of local self-government, and that these local questions should thus be withdrawn from consideration by the General Assembly, leaving that body more time to consider and pass upon general legislation . . . ."

However, the Home Rule Amendment does not confer legislative powers directly upon the charter jurisdictions. Instead, sections 1 and 1A of the Home Rule Amendment empower Baltimore City and the counties of Maryland to adopt a charter form of local government. *Jones v. Anne Arundel Cnty.*, 432 Md. 386, 402, 69 A.3d 426, 435 (2013). Section 2 requires the General Assembly to adopt legislation delegating express powers to Baltimore City and the charter counties. *See Ritchmount Partnership v. Board of Supervisors*, 283 Md. 48, 57, 388 A.2d 523, 529 (1978). Most of the express powers granted to Baltimore City by the General Assembly pursuant to Section 2 are contained in Article II of the Baltimore City Charter. *Id.*

Nevertheless, as the Maryland Court of Appeals explained in *Ritchmount*, 283 Md. at 56, 388 A.2d at 529, Art. XI-A and the legislation that followed do "not constitute a grant of absolute autonomy to local governments." *See also McCrory Corp.*, 319 Md. at 17, 570 A.2d at 836. Rather, the Home Rule Amendment limits Baltimore City and the charter counties to enacting "local laws." *Jones v. Anne Arundel Cnty.*, 432 Md. at 402, 69 A.3d at 435. If an ordinance enacted by Baltimore City or a charter county "does not constitute a 'local law' within the meaning of Article XI-A, it is beyond the authority of a charter county and, therefore, is unconstitutional." *Montgomery Cnty. v. Broadcast Equities, Inc.*, 360 Md. 438, 441 n.1, 758 A.2d 995, 996 n.1 (2000).

Notably, the Home Rule Amendment does not define the term "local law." It states: "Any law so drawn as to apply to two or more of the geographical subdivisions of this State shall not be deemed a Local Law, within the meaning of this Act." Md. Const. Art. XI-A, § 4; *see*

*McCrory Corp.*, 319 Md. at 17, 520 A.2d at 836.  In attempting to draw the line between a local

law and a general law, the Maryland Court of Appeals has observed that a local law "in subject

matter and substance" is "confined in its operation to prescribed territorial limits . . . ."  *Steimel*

*v. Board of Election Supervisors*, 278 Md. 1, 5, 357 A.2d 386, 388 (1976).  On the other hand, a

general law "'deals with . . . a subject which is of significant interest not just to any one county,

but rather to more than one geographical subdivision, or even to the entire state.'"  *Id.*; *see Cole*

*v. Secretary of State*, 249 Md. 425, 435, 240 A.2d 272, 278 (1968).

Despite this general guidance, "[a]ny complete or final definition of the term 'local law'

is . . . difficult to formulate and perhaps more difficult to apply with any proper degree of

uniformity or certainty." *Dasch v. Jackson*, 170 Md. 251, 260, 183 A. 534, 538 (1936).  Whether

a law is local or general is left to the "application of settled legal principles to the facts of

particular cases in which the distinction may be involved."  *Id.*  Courts must "look beyond the

form of the ordinance to its substance: some statutes, local in form, are general laws, since they

affect the interest of the whole state."  *Holiday Universal, Inc. v. Montgomery Cnty.*, 377 Md.

305, 315, 833 A.2d 518, 524 (2003) (internal quotation marks omitted).  Indeed, the Maryland

high court has applied the Home Rule Amendment on several occasions to invalidate local

enactments.

For example, in *Gaither v. Jackson*, 147 Md. 655, 667, 128 A. 769, 773–74 (1925), the

Maryland Court of Appeals held that a statute providing for the gubernatorial appointment of

auctioneers in Baltimore City, with their license fees paid to the State, was not a "local law"

because it "provide[d] revenue for the whole state."  Therefore, the court found invalid a local

ordinance purporting to repeal that statute. *Id.*  Similarly, in *Bradshaw v. Lankford*, 73 Md. 428,

21 A. 66 (1891), the court invalidated a Somerset County ordinance that prohibited oyster dredging in water located within the county, noting that "the oyster-beds, within the waters of Somerset county, do not belong to the people of that county . . . . They belong to the state." *Id.*, 21 A. at 67. The court reasoned that "it would be against every principle of sound legislative policy" to allow the county to affect the "common right of the people of the whole state." *Id.* Together, *Gaither* and *Bradshaw* make clear that an ordinance that operates only within the physical boundaries of a county (or Baltimore City) may still run afoul of the Home Rule Amendment if it has a substantial effect outside of that locale.

By contrast, in *Tyma v. Montgomery County*, *supra*, 369 Md. 497, 801 A.2d 148, the court upheld against constitutional challenge the Montgomery County Council's "Employee Benefits Equity Act of 1999." The Act extended "health, leave, and survivor benefits comparable to those afforded the spouses of County employees, to the domestic partners of County employees." *Id.* at 501, 801 A.2d at 150. Although the legislation applied to all county employees, regardless of whether they were county residents, the court observed that "the only employer the ordinance impacts is the County; it has no effect outside the County and, therefore, no statewide interests are affected." *Id.* at 515, 801 A.2d at 158.

One other case warrants mention. The parties both identify *Holiday*, *supra*, 377 Md. 305, 833 A.2d 518, as the most relevant precedent, yet they construe it quite differently. The ordinance in *Holiday*, enacted by the Montgomery County Council, purported to regulate membership contracts between individuals and, *inter alia*, health spas, dance studios, and dating services. The ordinance applied to any such membership contract signed in Montgomery County or that related to services that would "primarily be provided" in Montgomery County. *Id.* at 308,

833 A.2d at 520.  A group of businesses challenged the ordinance on several grounds, including that it was not a valid "local law" under the Home Rule Amendment.  *Id.*

Concluding that the ordinance was unconstitutional, the Maryland Court of Appeals reasoned, *id.* at 319, 833 A.2d at 526–27: "[T]he ordinance substantially affects persons and entities outside of Montgomery County, many of whom would have little or no connection with Montgomery County.  Under our cases, it is not a local law and is facially unconstitutional under Article XI-A of the Maryland Constitution."  The court further explained, *id.* at 316, 833 A.2d at 525 (emphasis in original):

> [T]he ordinance makes clear that it would apply to a contract signed outside of Montgomery County, by parties residing outside of Montgomery County, where as much as forty-nine percent of the performance of the contract takes place outside of Montgomery County.  Even more significantly, the ordinance applies to a contract fortuitously signed in Montgomery County, by parties who reside outside of Montgomery County, where *none* of the performance takes place within Montgomery County.

Defendants claim that *Holiday* militates in their favor because it invalidated an ordinance that purported to apply to contracts signed beyond the physical borders of Montgomery County.  *See* Memo at 14.  And, according to defendants, the analogous transaction in this case—the ticket sale—also took place outside of the borders of the relevant locale.  On the other hand, plaintiff argues that *Holiday* supports his position.  He likens membership contracts to ticket sales, and claims that *Holiday* establishes that the controlling factor in determining whether a law affecting membership contracts is "local" is the "place where the contract would be performed . . . ."  Opp. at 17.  And, because it is undisputed that the ticket at issue was for an event in Baltimore City, plaintiff maintains that the Licensing Ordinance is valid and applies.

In my view, both parties overread *Holiday*. Contrary to defendants' characterization, *Holiday* did not hold the county ordinance invalid solely because it might apply to transactions consummated outside of the county. Rather, the court took issue with application of the ordinance to such transactions because "as much as forty-nine percent of the performance of the contract takes place outside of Montgomery County" and the parties all resided "outside of Montgomery County." *Holiday*, 377 Md. at 316, 833 A.2d at 525. At most, only one of these three circumstances is present with regard to Bourgeois, who resides in the City and bought a ticket to a concert scheduled to take place in the City from the agent of a Baltimore venue.[17] And, contrary to Bourgeois's characterization, *Holiday* does not hold that the only relevant consideration is the place where the contract is to be performed. The fact that the membership contracts in *Holiday* might be performed outside of Montgomery County was certainly a concern of the court, but the court also looked to the place where the contract was signed as well as whether the parties to the contract resided in Montgomery County.

*Holiday*, *Tyma*, *Gaither*, and *Bradshaw* provide a framework by which to distinguish local laws from general laws. But, these cases also highlight the difficulty of the constitutional question in this case.

In my view, *Edwards Systems Technologies v. Corbin*, 379 Md. 278, 293, 841 A.2d 845, 854 (2004), and the doctrine of constitutional avoidance, illuminate the path out of this quandary.

---

[17] Defendants object to plaintiff's characterization of Baltimore City as the place of performance. In defendants' view, the sale of the ticket is distinct from the event to which it guarantees entry. Therefore, according to defendants, the place of performance is the place where the sale is consummated, regardless of where the event will take place. I need not resolve this dispute here.

In *Edwards*, the Maryland Court of Appeals analyzed § 2-222 of the Prince George's County Code (1999), which provided, in Division 12: "No employer in the County shall discharge or refuse to hire any person, or act against any person with respect to compensation or other terms and conditions of employment, or limit, segregate, classify or assign employees because of discrimination." In interpreting this provision, the court observed: "The language '[n]o employer in the County' may be ambiguous with regard to discriminatory acts outside of Prince George's County by employers with a presence in the County." *Edwards*, 379 Md. at 293, 841 A.2d at 854. In the face of that ambiguity, the court invoked the canon of constitutional avoidance, cited *Holiday*, and construed the provision as applying only to discrimination "*occurring in Prince George's County* by an employer with a significant presence in Prince George's County." *Id.* at 294, 841 A.2d at 854 (emphasis added).

The constitutional question raised by the Exhibitor Provision is sufficiently similar to that raised in *Edwards*, so as to persuade me to follow the course charted by the *Edwards* Court. The Exhibitor Provision, like the provision in *Edwards*, proscribes certain conduct by local entities, but is ambiguous as to whether it also applies when those entities engage in the proscribed conduct outside of the locality. And, as in *Edwards*, applying the Exhibitor Provision to conduct outside of Baltimore City raises the constitutional questions explored in *Holiday* and the cases cited there. Accordingly, as in *Edwards*, I will construe the Exhibitor Provision to apply only to ticket sales that occur within the City.[18]

---

[18] Because I have construed the Ordinances to apply only to ticket sales occurring within the City, I need not address defendants' contention that extraterritorial application of the Ordinances would run afoul of the Constitution's Commerce Clause, Art. I, § 8, cl. 3. *See* Memo at 16–20.

The analysis differs for the Police Ordinance, but the outcome is the same. Unlike the Licensing Ordinance, the Police Ordinance is not part of a licensing scheme, and it does not only apply to licensees. Instead, it applies to "*any* person, firm, association, or corporation." *Id.* (emphasis added). The only geographic limitation in the text of § 55 is that it applies only to sales of tickets for events that occur in Baltimore. But, it does not explicitly limit its application to sales occurring within the physical boundaries of Baltimore.

Defendants contend, as they did with regard to § 21, that the Court should read a geographic limitation into the provision so as to limit its application to the physical limits of Baltimore City. Because § 55 is an exercise of the City's police power, rather than part of a licensing scheme, and because the police power is inherently limited to operation within the physical boundaries of Baltimore City, I agree with defendants that their interpretation is the only reasonable one.

The term "police power," at its core, "connotes the time-tested conceptional limit of public encroachment upon private interests." *Goldblatt v. Town of Hempstead, N. Y.*, 369 U.S. 590, 594 (1962). The Maryland Court of Appeals has defined the "police power" as "the power inherent in the state to prescribe within the limits of the federal and state Constitutions reasonable regulations necessary to preserve the public order, health, safety, or morals." *Tighe v. Osborne*, 149 Md. 349, 131 A. 801, 803 (1925); *see VNA Hospice of Maryland v. Dep't of Health & Mental Hygiene*, 406 Md. 584, 601 n.8, 961 A.2d 557, 567 n.8 (2008).

The Baltimore City Charter provides that the Mayor and City Council of Baltimore "shall have power by ordinance . . . [t]o have and exercise *within the limits of Baltimore City* all the power commonly known as the Police Power . . . ." Balt. City. Charter, Art. II, § 27 (emphasis

added).  Under this provision, the City's police power is broad and comprehensive.  *Rossberg v. State*, 111 Md. 394, 74 A. 581, 582 (1909).  But, it is expressly limited to the physical boundaries of Baltimore City.  This limitation accords with the notion that the police power is an inherent element of sovereignty.  *Goldman v. Crowther*, 147 Md. 282, 128 A. 50, 55 (1925).  And, Baltimore City's exercise of its police power outside its own boundaries would intrude on the sovereignty of another city, county, or state, as the case may be.  Accordingly, the City generally may not utilize its police power to encroach upon private behavior taking place outside of the City limits; to do so would intrude on another sovereign's right to allow within its own borders the behavior that Baltimore prohibits.

In light of these principles, the only possible way to square the Police Ordinance with the City Charter and fundamental principles of sovereignty is to read into it a geographic limitation that limits its application to ticket sales occurring within Baltimore City.  Indeed, numerous ordinances within Article 19 of the City Code would be nonsensical unless they contained an implied limitation to the physical boundaries of Baltimore City.  For example, § 25-1 of the Article 19 of the City Code prohibits loitering in public places or places open to the public.  The ordinance defines public places as, *inter alia*, "any public street, road, or highway, alley, lane, sidewalk, crosswalk, or other public way, or any public resort," but it does not explicitly limit application of the ordinance to locations within Baltimore City.  Yet, no one would seriously contend that the Baltimore City police could issue a citation to a Baltimore resident who happened to be loitering in Montgomery County.  Similarly, § 33-2(a)(2) provides: "It shall be unlawful for any minor: (2) to drink or have in his or her possession any alcoholic beverages." But, it does not specify that the possession must occur within Baltimore City.  Yet, the City

surely cannot issue a citation to a minor in possession of alcohol in Washington D.C. on the ground that he resides in Baltimore City.

This conclusion is not affected by the fact that the tickets in question grant entry to events taking place within Baltimore City. The conduct being restrained by the Police Ordinance is the "[sale] or exchange" of tickets for above face-value, and so the only relevant location in the inquiry is the place where that sale or exchange is made. Although Baltimore City might be able to prohibit the *use* of a scalped ticket in Baltimore, without regard to where the sale took place, it has chosen to criminalize the sales activity. And, when that sales activity takes place outside of Baltimore City, the City's police power does not reach it. *See State ex rel. Gildar v. Kriss*, 191 Md. 568, 573, 62 A.2d 568, 569 (1948) ("Ordinarily a statute is not applicable extraterritorially, but only to acts done within the jurisdiction . . . .").

In light of the inherent limitations on the City's police power and the structure of other provisions within Article 19 of the City Code, it is clear that the City cannot use its police power to issue a citation to an individual for the sale of a ticket at above face-value for an event in Baltimore if that sale occurs outside of the City. Attempting to restrain such conduct would intrude upon the sovereignty of a neighboring county or state, and it would exceed the bounds of the grant of police power in the City Charter.

Moreover, even if the police power were not inherently limited, application of the Police Ordinance to ticket sales that occur outside of Baltimore City would raise the same constitutional doubts as does the Licensing Ordinance. Accordingly, I would be compelled to avoid the reading that raises constitutional doubts and adopt a reading that limits the Police Ordinance's

application to conduct occurring within Baltimore.[19]  Thus, under either mode of analysis, the Police Ordinance does not apply to ticket sales that occur outside the physical boundaries of Baltimore City, even if the sales are for events within the City limits.

To sum up, neither the Licensing Ordinance nor the Police Ordinance applies when licensed exhibitors or their agents (like the Lyric and Ticketmaster, respectively) sell tickets outside of Baltimore City, even if those tickets are for events in Baltimore.  This conclusion, however, does not resolve the matter before the Court.  As discussed, Bourgeois purchased his ticket over the internet.  Accordingly, the next question is whether and under what circumstances a ticket sale conducted over the internet occurs "within" Baltimore.

Defendants contend that when a customer purchases a ticket over the internet—at least when the ticket is purchased from a "California-based company" like Ticketmaster, Memo at 14—the transaction takes place somewhere other than in Baltimore.  Defendants do not explain where such a transaction takes place; they merely assert that it *does not* take place in Baltimore, even if the purchaser was in Baltimore and even if the ticket grants entry to an event held in Baltimore.  *See* Memo at 14 ("The sale of the ticket on an Internet website does not occur in Baltimore City because the website is not a location in the City.").

To the extent that defendants offer support (as opposed to *ipse dixit*) for their claim that an internet transaction cannot, as matter of law, take place in Baltimore, their arguments are

---

[19] The lack of clarity about the Police Ordinance's geographic reach might also raise due process concerns if Baltimore City sought to impose criminal penalties against an individual for selling tickets outside of City limits for events within City limits.  *See, e.g.*, *United States v. Aquino-Chacon*, 109 F.3d 936, 938 (4th Cir. 1997) ("Due process requires that a criminal statute give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden since no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." (internal quotations omitted)).

unavailing. First, defendants contend that their "understanding of the reach of the ordinances" is supported by "the views of Baltimore City officials themselves." Memo at 14. Specifically, defendants refer to comments purportedly made in 2009 by then-Mayor Sheila Dixon that "'the Internet is not a location.'" *Id.* at 14–15.[20] Even if the Mayor made such a statement in relation to the Ordinances, it of course would not have any impact on this Court's legal determination. *See Marbury v. Madison*, 5 U.S. 137 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); *see also Bourgeois*, 430 Md. at 35, 59 A.3d at 521 (dismissing a similar argument as "wholly irrelevant").

Defendants next posit that internet sales are "not transformed into a sale entirely within the City simply because the ticket was for an event scheduled to be held in the City." Memo at 15. This argument assumes its conclusion; it proceeds from the premise that an internet ticket sale takes place outside of Baltimore and would need to be "transformed" into a local sale in order to be governed by the Ordinances. The validity of this "premise," of course, is the very question before the Court.

Defendants also resort to their oft-repeated refrain that Ticketmaster is a "California-based" company, and therefore its sales cannot occur in Baltimore. *See, e.g.*, Memo at 15. This argument is equally without merit. Even ignoring that, at all times relevant to this case, Ticketmaster was acting as agent for a venue located within Baltimore, the fact that Ticketmaster is "based" in California is irrelevant to the question of where its sale to plaintiff took place. For

---

[20] Defendants cite to their "Exhibit D," which purports to include excerpts from the bill file for Baltimore City Council Bill No. 08-228. However, and as discussed, in resolving a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013). The contents of Exhibit D are not integral to the Complaint. Accordingly, I may not consider the exhibit at this juncture.

example, Apple is also a California-based company, and yet its sales of iPhones in the Towson Mall surely take place in Baltimore County.

In my view, the question of the location of Ticketmaster's internet sales is unsuitable for resolution at the motion to dismiss stage; further factual development is needed. The reality is that "geography . . . is a virtually meaningless construct on the Internet." *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 169 (S.D.N.Y. 1997). To illustrate, a credit card transaction over the internet typically involves four parties, all of whom could be in different physical locations, and all of whom may send information across state lines. Those parties include the customer (*e.g.* Bourgeois), the merchant (*e.g.* Ticketmaster), the bank which issued the credit card, and an "acquirer," which validates credit card information presented by a merchant and approves sales based on the customer's credit status. *See generally* V. Rajaraman, *Essentials of E-Commerce Technology* 118–124 (PHI Learning Private Limited 2010). I cannot say as a matter of law that all of Ticketmaster's internet sales to events in Baltimore take place in Baltimore, nor can I say as a matter of law that they take place outside of Baltimore.[21] Rather, the "location" of those sales may depend, *inter alia*, on the mechanics of the purchase process on the Ticketmaster website (including, *e.g.*, whether the purchaser of tickets is the offeror or the offeree); the location from which the purchaser accessed the Ticketmaster website; the location at which the purchaser's electronic funds were received; the location from which Ticketmaster and/or the Lyric sent the tickets to the purchaser; the location at which the purchaser received the tickets; and, perhaps, the location of the event for which the ticket grants entry. At this point in the

---

[21] Although the Terms of Use on the Ticketmaster website contain a choice-of-law provision, *see* Memo Ex. A, the question of what substantive law applies is distinct from the question of where the contract was made. *See* Restatement (Second) of Conflict of Laws § 188 (1971).

action, it is sufficient that Bourgeois alleges that Ticketmaster collected service fees in violation of the Ordinances, and that defendants have not shown that application of the Ordinances to their internet ticket sales necessarily would be unconstitutional or otherwise improper.

Moreover, at least one aspect of Bourgeois's suit would remain viable regardless of "where" the relevant ticket sale occurred. The Licensing Ordinance not only prohibits the *sale* of a ticket for more than face value; it also prohibits any exhibitor from "accept[ing], or receiv[ing], directly or indirectly, any greater amount than such regular or established price" printed on the ticket. Leaving aside the issue of "where" plaintiff purchased his ticket, plaintiff clearly alleges that the Lyric *received* and/or *accepted* more than the established price for the ticket he purchased. *See* Compl. ¶ 43 (alleging that Ticketmaster provided a "kickback" to the Lyric). And, it is undisputed that the Lyric is located within Baltimore City. Thus, the Lyric's alleged receipt of "kickbacks," in excess of the amount printed on the ticket, would not present any concerns about extraterritorial application of the Licensing Ordinance.

In sum, Bourgeois has alleged that defendants sold tickets in violation of the Ordinances. He has also alleged that the Lyric's receipt of "kickbacks" violated the Licensing Ordinance. At this juncture, defendants cannot obtain dismissal of Bourgeois's claim on the ground that the "ordinances do not and cannot validly apply" to Bourgeois's ticket purchase. *See* Memo at 1.

### B. In Pari Delicto

Defendants contend that, even if the Ordinances apply to plaintiff's purchase, the doctrine of *in pari delicto* bars plaintiff's claim for money had and received. The common law doctrine of *in pari delicto* "derives from the Latin, *in pari delicto potior est conditio defendentis:* 'In a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one.'"

*Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (quoting Black's Law Dictionary 711 (5th ed. 1979)); *see Schneider v. Schneider*, 335 Md. 500, 508, 644 A.2d 510, 514 (1994); *Catler v. Arent Fox, LLP*, 212 Md. App. 685, 71 A.3d 155, 181 (2013). The doctrine reflects the beliefs that "courts should not lend their good offices to mediating disputes among wrongdoers" and that "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Bateman Eichler*, 472 U.S. at 306; *see Adams v. Manown*, 328 Md. 463, 487, 615 A.2d 611, 623 (1992) (H. Chasanow, J., concurring and dissenting) (quoting *Messick v. Smith*, 193 Md. 659, 669, 69 A.2d 478, 481 (1949)).

The issue of *in pari delicto* was discussed at length by the *Bourgeois* Court. The court confirmed that an action for money had and received is viable under Maryland law "to recover money obtained by fraud or false pretenses, paid upon an unexecuted illegal contract, or, in certain circumstances, paid under an executed illegal contract." *Bourgeois*, 430 Md. at 48, 59 A.3d at 529. With regard to this case, the court noted, *id.* at 48–49, 59 A.3d at 529:

> The branch of the action that appears to be the one most on point, based on the complaint and the plaintiff's brief, is that the service charges were paid pursuant to an illegal, and thus allegedly void, agreement. The illegal transaction, according to the complaint, involved both the agreement the plaintiff made with Ticketmaster to purchase the ticket, pursuant to which Ticketmaster exacted the illegal surcharge, and the Facility Agreement between Ticketmaster and Lyric that purported to authorize Ticketmaster to exact the service charge and to require the rebate of part of it to Lyric.

Although the court stressed that "an action for money had and received does lie to recover money paid under an *executory* illegal contract—one not yet fully consummated," the court cautioned that the action "generally" *does not* lie "to recover money paid under a fully executed contract." *Id.* at 49, 59 A.3d at 529 (emphasis in original). In the case of a fully

executed contract, "the parties *ordinarily* are *in pari delicto* and neither should be able to take advantage of the illegality." *Id.* (emphasis in original).

However, the court recognized an exception to the rule of *in pari delicto,* "where the illegality arises from the exaction of usurious interest. In that situation, the borrower has not been regarded as being *in pari delicto* with the lender." *Id.* at 49, 59 A.3d at 529–30. Noting that this "exception remains a part of Maryland law," *id.* at 50, 59 A.3d at 530, the court concluded, *id.* at 49–51, 59 A.3d at 529–31 (emphasis added):

> This Court has not repudiated the general principle that parties to a fully executed illegal contract, except one exacting usurious interest, ordinarily are regarded as being *in pari delicto* and that, as a result, the common law action for money had and received does not lie to recover money paid under such a contract. Nor has it disavowed the reasoning long ago accepted for that principle.[]

> Based on these long-established common law distinctions and limitations, we conclude that an action for money had and received will lie to recover money paid in excess of that allowed under the Baltimore City ordinances if the agreement exacting that excess remains executory—not fully consummated and thus subject to disaffirmance. *If the agreement is fully executed, however, and there are no special circumstances that would preclude a finding that the parties were in pari delicto, the action will not lie. The resolution of that issue, at least in part, is a factual matter for the District Court to determine.*

Although the *Bourgeois* Court discussed only one genre of "special circumstances" (*i.e.,* usurious interest), other Maryland cases have articulated various factual scenarios that would preclude a finding that parties to an executed, illegal contract are *in pari delicto.* Long ago, in *Roman v. Mali*, 42 Md. 513, 532 (1875), the Maryland Court of Appeals observed:

> There may be different degrees of guilt as between the parties to the fraudulent or illegal transaction; and if one party act [sic] under circumstances of oppression, imposition, undue influence, or at great disadvantage with the other party concerned, so that it appears that his guilt is subordinate to that of the defendant, the court, in such case, will relieve.

Of import here, Maryland courts have recognized that, "[w]hen a transaction involves violation of a statute," and "the plaintiff is one of a class for whose protection or benefit the statute was enacted, he may be regarded as not *in pari delicto*." *Messick v. Smith*, 193 Md. 659, 669, 69 A.2d 478, 481 (1949) (italicization added); *see Thomas v. Richmond*, 79 U.S. 349, 355 (1871) ("[W]here the law that creates the illegality in the transaction was designed for the coercion of one party and the protection of the other . . . there is no *parity of delictum* at all between the parties, and the party so protected by the law . . . may, at any time, resort to the law for his remedy, though the illegal transaction be completed."); *Cronin v. Hebditch*, 195 Md. 607, 619, 74 A.2d 50, 55 (1950) ("To determine whether in a particular case the parties are equally at fault, it may be necessary to consider whether the policy of the law would be better promoted by denying recovery or by permitting recovery in whole or in part.").

Judge Quarles recently explored this exception in *Mitchell Tracey v. First Am. Title Ins. Co.*, Civ. No. WDQ-12-1329, 950 F. Supp. 2d 807 (D. Md. 2013).[22] *Mitchell Tracy* arose out of two title insurers' "alleged scheme to systematically 'cheat' Maryland homeowners by charging premiums for title insurance in excess of the rates permitted by Maryland law." *Id.* at 808. The plaintiffs claimed that their title insurance premiums were collected under agreements that violated Maryland Code (2011 Repl. Vol.) § 27-216(b)(1) of the Insurance Article ("Ins."), and they filed, *inter alia*, a claim for money had and received. As is the case here, the contracts in *Mitchell Tracy* were fully executed and, as is the case here, there was "no allegation that the relevant contracts exacted usurious interest." *Id.* at 810–11.

---

[22] Plaintiff submitted Judge Quarles's opinion in *Mitchell Tracy* as "Supplemental Authority in Further Support of Plaintiff's Opposition to Defendants' Motions to Dismiss." ECF 69. Defendants filed a "Response to Plaintiff's Supplemental Authority Concerning Motion to Dismiss." ECF 70.

After the Maryland Court of Appeals issued its opinion in *Bourgeois*, the defendants in *Mitchell Tracy* moved to dismiss the claim for money had and received on the grounds that the plaintiff and defendants were *in pari delicto*. Citing *Thomas*, 79 U.S. 349, and *Messick*, 193 Md. 659, 69 A.2d 478, Judge Quarles examined Ins. § 27-216 to determine whether the plaintiffs were within the class of persons for whose protection the statute was enacted. Finding that they were, Judge Quarles concluded that the plaintiffs were not *in pari delicto*. He explained, *Mitchell Tracy*, 950 F. Supp. 2d at 811 (citations omitted):

> The purpose of Title 27 is "to regulate trade practices in the business of insurance . . . by defining . . . all trade practices in the business of insurance in the State that are unfair methods of competition or unfair or deceptive acts or practices and by prohibiting those trade practices." The Plaintiffs, as insurance purchasers, were allegedly subjected to unfair trade practices by the defendant insurance company, and are thus within the class of persons for whose protection or benefit the statute was enacted . . . . [T]hese circumstances preclude a finding that the parties were *in pari delicto*.

Before this Court, the parties dispute whether any special circumstances are present that would preclude or compel a finding that the parties were *in pari delicto*. Bourgeois claims that he and the proposed class members are within the class of persons whom the Ordinances were designed to protect. Opp. at 29. According to Bourgeois, the Licensing Ordinance was "enacted as a measure to protect purchasers of tickets to events in Baltimore City from exorbitant ticket prices," and sought to do so by imposing restrictions on licensed exhibitors and agents who sell such tickets. *Id.* Therefore, he insists that they are not *in pari delicto* with the defendants. *Id.* Defendants disagree. They posit: "A fair reading of the Ordinances demonstrates that their primary purpose is to protect the pricing integrity of the ticket buying/selling marketplace, and not individual ticket purchasers." Reply at 13. According to defendants, this purpose "is

underscored by the fact that the Ordinances themselves do not provide a private cause of action for their alleged violation. Instead, they provide solely for criminal penalties." *Id.*

The Bourgeois Court made clear that the Ordinances were enacted to protect ticket buyers, as opposed to some amorphous notion of "pricing integrity." As the court recounted, the first version of what are now §§ 21-1 through 21-5 "was enacted because 'Baltimoreans [were] being deprived of tickets to the Navy–Notre Dame football game . . . except at exorbitant prices.'" *Bourgeois*, 430 Md. at 29–30, 59 A.3d at 518 (quoting William J. Muth, then Vice President of the City Council and one of the sponsors of the bill). Councilman Muth claimed that scalpers had purchased all of the available tickets to the game, and would only sell them to Baltimoreans at prices that far exceeded face value. *Id.* Quite clearly, the aim of the initial bill was to constrain these ticket sellers and to protect potential local ticket buyers. Although the Ordinance is now in a different form than when it was first enacted, there is no suggestion in *Bourgeois* or in defendants' brief that the current version of the Ordinances arose from motivations that differed from the original bill. Because the purpose of the Ordinances is to protect ticket buyers, I cannot say, as a matter of law, that plaintiff is *in pari delicto* with defendants. Therefore, he may pursue a cause of action for money had and received.[23]

Defendants' observation that the Ordinances do not provide a private cause of action for ticket scalping does not alter this conclusion; the Baltimore City Council does not have the constitutional authority under the Home Rule Amendment to create private causes of action. For example, in *McCrory Corp.*, *supra*, 319 Md. 12, 570 A.2d 834, the Maryland Court of Appeals invalidated as unconstitutional an attempt by Montgomery County to create a private cause of

_____

[23] In view of this conclusion, I need not address defendants' argument that the doctrine of *in pari delicto* also bars plaintiff's other common law and statutory claims. *See* Memo at 29–30.

action to combat employment discrimination. The court explained that "the creation of new causes of action in the courts has traditionally been done either by the General Assembly or by this Court under its authority to modify the common law of this State." *Id.* at 20, 570 A.2d at 838. As a result, the Montgomery County ordinance at issue was not a "'local law' under Article XI-A of the Maryland Constitution, and thus [was] not within the power of Montgomery County to enact." *Id.* at 84, 570 A.2d at 840; *see Gunpowder Horse Stables, Inc. v. State Farm Auto. Ins. Co.*, 108 Md. App. 612, 633, 673 A.2d 721, 732 (1996) ("[A] county [or Baltimore City] may not create a new cause of action between private parties concerning matters of statewide concern.").[24] The same principle would have applied to Baltimore City's attempt to create a private cause of action for violation of the Ordinances.

In any event, a legislature's decision to pursue its policy goal through a licensing scheme and criminal prohibitions, rather than by creating private causes of action, says nothing about the persons or entities the legislature sought to protect, or its purpose in enacting the legislation. There is also no private cause of action for the crime of child abuse, *see* Md. Code. (2012 Repl. Vol., 2013 Supp.), §§ 3-601 *et seq.* of the Criminal Law Article, but no one would deny that the law is meant to protect children. Moreover, as was likely the case with the crime of child abuse, it is also possible that the Baltimore City Council desired that the Ordinances be privately

---

[24] Notably, before the Maryland Court of Appeals, Lyric argued in its brief that, "[e]ven if Baltimore City had intended to create a private right of action, it lacked the authority to do so." Yet, in this Court, defendants attempt to attach significance to Baltimore's "decision" not to create a private cause of action to enforce the Ordinances. In the words of Justice Kagan in the face of what she viewed as an audacious argument: "Some people might call that *chutzpah*." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, ___ U.S. ___, 131 S. Ct. 2806, 2835 (2011) (Kagan, J., dissenting); *cf. Eagan v. Calhoun*, 347 Md. 72, 88, 698 A.2d 1097, 1105 (1997) (addressing "estoppel by admission" and stating: "Generally speaking, a party will not be permitted to maintain inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him . . . .").

enforceable, but believed that the common law already provided causes of action under which an overcharged ticket buyer could bring suit. Whatever the rationale, the City Council's decision to omit a private cause of action to enforce the Ordinances does not necessitate a finding that plaintiff was *in pari delicto* with defendants.

### C. Other Equitable Considerations

Defendants also argue that other "equitable considerations require denial of Plaintiff's claims." Memo at 25. First, they contend that permitting plaintiff's claim to proceed would "incentivize ticket buyers to foster scalping." Defendants fail to explain this contention, and it is not apparent why ticket buyers would ever have an incentive to buy scalped tickets with illegal fees, even if they could later recover the illegal fees in a lawsuit. As between 1) paying face value and 2) paying face value and an illegal fee and then filing a lawsuit to recoup the illegal fee, it is obvious that ticket buyers would choose the first option.

Next, defendants claim that the ticket buyers' recovery of the illegally extracted fees would be a "windfall," Memo at 28, and that "[t]his windfall would be based solely on a fortuity that the [Maryland] Court of Appeals, after the fact, interpreted what it agreed were confusing and antiquated ordinances in a manner different from how they had been understood in the past . . . ." *Id*. But, plaintiff does not seek a full refund for his concert ticket. Rather, he seeks to recover only the amount that he claims he was illegally charged, in excess of the price listed on the face of the ticket. And, restitutionary relief is not a windfall. Although defendants express concern that "[a] class would demand the return of all service charges on every ticket sold by Defendants to events in Baltimore City spanning a period of several years," Memo at 28, such a

consequence is akin to remedies sought from those who are alleged to be civilly liable for violation of the law.

Defendants rely on *Citaramanis v. Hallowell*, 328 Md. 142, 613 A.2d 964 (1992). In their view, the equitable considerations applied in *Citaramanis* "dictate the fate" of plaintiff's Complaint. Memo at 26.

In *Citaramanis*, the plaintiffs lived as tenants in a house for eighteen months. After the plaintiffs informed the landlords of their intent to vacate the property, they discovered that the house was not licensed as rental property by the county. The plaintiffs filed suit seeking, *inter alia*, restitution of the rent they had paid over the prior eighteen months. However, the plaintiffs did not allege that the property was uninhabitable or otherwise unsuitable. Rather, their claim was premised solely on the landlord's lack of a license. *Id.* at 144–45, 613 A.2d at 965–966.

The plaintiffs argued that they were entitled to summary judgment on their restitution claim because the rent was paid pursuant to an illegal and unenforceable lease. The court rejected their argument. The court first explained that whether an illegal contract will be enforced is "a function of the strength of the public policy involved together with the degree of the violation of that policy under the facts of the case." *Id.* at 158, 613 A.2d at 971–72. The court suggested that the public policy behind the license requirement was not directly implicated because its purpose was to make it easier for inspectors to identify premises rather than to regulate landlords' activity. *Id.* at 162, 613 A.2d at 973. Second, the court held that, from the record, it appeared that "the tenants have received everything that they bargained for, and a necessary element justifying the remedy of restitution, *i.e.,* unjust enrichment, is lacking." *Id.* at 159, 613 A.2d at 972. In other words, the plaintiffs had failed to show any actual damages that

had resulted from the landlord's violation of the law. Therefore, the court remanded the case, directing that the plaintiffs must establish that they suffered actual loss or were provided less than they had bargained for in the lease. *Id.* at 163–64, 613 A.2d at 974; *see Galola v. Snyder*, 328 Md. 182, 186, 613 A.2d 983, 985 (1992) (discussing *Citaramanis*).

In my view, *Citaramanis* is inapposite. *Citaramanis* might have been on point if Bourgeois were seeking to recover the *face value* of the ticket solely because of Ticketmaster's failure to obtain a license. The plaintiffs in *Citaramanis* failed to provide any evidence that they paid more than they would have in the absence of the illegality; the illegality caused them no harm. In contrast, Bourgeois's claim rests on the express allegation that the ticket fees he paid in excess of the face value of the ticket price were illegal, and therefore, the illegal actions of defendants caused him financial harm. Moreover, the *Citaramanis* Court determined that the public policy at issue in that case was not strongly implicated and suggested that the defendant's violation was "'not of a serious nature.'" *Citaramanis*, 328 Md. at 163, 613 A.2d at 974 (quoting *Schloss v. Davis*, 213 Md. 119, 125, 131 A.2d 287, 291 (1957)). Here, by contrast, the public policy behind the Ordinances is directly implicated, and plaintiff is squarely in the class of those intended to benefit from the Ordinances.

In sum, the equitable considerations identified by defendants do not bar plaintiff's claim for money had and received. The "fortuity" on which defendants blame their potential liability is the law. Whether or not defendants agree with the law, whether or not the law is "antiquated," and whether or not enforcement of the law would "inflict . . . punishment on Defendants," Memo at 28, the Court must enforce the law if it is valid and applicable. As the *Bourgeois* Court said, 430 Md. at 39, 59 A.3d at 524: "The ordinance may be functionally obsolete [in terms of the

mere 50¢ markup it allows], but it is not legally so. The City Council has had the ordinance before it several times since 1949 . . . but has seemed content to leave its fundamental provisions intact."[25]

### D. The Voluntary Payment Doctrine

Defendants contend that plaintiff's claims are barred by the "voluntary payment doctrine" and therefore must be dismissed. According to defendants, the voluntary payment doctrine bars a plaintiff from recovering money he paid with full knowledge of the relevant facts. Memo at 31. And, they contend that plaintiff, according to his own allegations, "'was aware that service fees in excess of the price on the ticket were being charged by Ticketmaster, and he knew what they were.'" Memo at 33 (quoting *Bourgeois*, 430 Md. at 48, 59 A.3d at 529 (2013).

Defendants' argument is untenable both legally and factually. As a legal matter, the "voluntary payment doctrine" does not apply to plaintiff's claim. As a factual matter, plaintiff *does* allege that he proceeded under a mistake of fact.

The "voluntary payment doctrine," as relied upon by defendants, does not apply to those claims for money had and received in which the plaintiff seeks recovery of a payment made pursuant to an executed, illegal contract. Rather, the "voluntary payment doctrine" is simply a distinction that courts draw between plaintiffs seeking to recover money paid under a mistake of fact from those seeking to recover money paid under a mistake of law.

This conclusion is evident from the *Bourgeois* Court's discussion of the many branches of the cause of action for money had and received. It explained that one of those branches is implicated when a plaintiff seeks to recover money paid under a mistake of fact. For example, if

---

[25] As noted, the City Council repealed the Ordinances after the Court of Appeals's decision in *Bourgeois* and replaced them with a new Article 2, Subtitle 16, titled "Ticket Sales".

a plaintiff makes a mathematical error and pays a defendant an amount in excess of his actual debt, the plaintiff may bring an action for money had and received to recover that excess. *See Baltimore & S.R. Co. v. Faunce*, 6 Gill 68, 69 (1847). The *Bourgeois* Court distinguished a mistake of fact, pursuant to which a plaintiff can recover, and a mistake of law, pursuant to which recovery is generally unavailable. *Bourgeois*, 430 Md. at 48, 59 A.3d at 528–29 (citing *Poe's* § 119). The rationale behind this distinction is that someone with full knowledge of the facts who chooses to make a payment should not later be permitted to change his mind and invoke the aid of the courts. *See Halle Dev., Inc. v. Anne Arundel Cnty.*, 371 Md. 312, 326–27, 808 A.2d 1280, 1289 (2002); *cf. BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 768-69 (Tex. 2005) ("If he thinks [the payment is not justly due], he should resist. He should not pay out his money, leading the other party to act as though the matter were closed . . . ."). *Poe's* explains, at § 119: "The general rule is, that [a claim for money had and received] is not sustainable to recover money which has been fairly and voluntarily paid with a full knowledge of the facts and circumstances under which it is demanded, upon the ground that the payment was made under a misapprehension of the legal rights and obligations of the party. Voluntary payments, *when once made with full knowledge of the facts*, cannot be recovered."

Although the Bourgeois Court noted that the distinction between mistakes of fact and mistakes of law has blurred in recent years, 430 Md. at 48, 59 A.3d at 528–29, it confirmed that the general principle remains viable: A plaintiff who brings a claim for money had and received based upon a mistake of fact may recover, whereas a plaintiff who brings a claim for money had and received based upon a mistake of law generally may not. Although defendants argue that Bourgeois proceeds only under a mistake of law and therefore is barred from recovery, the

reality is that Bourgeois's claim is not based on any mistake at all; rather, he proceeds under a different branch of the action for money had and received.

Subsequent to its discussion of mistakes of fact and law, the *Bourgeois* Court moved on to address other branches of the action for money had and received. The court stated, 430 Md. at 48, 59 A.3d at 529 (emphasis added): "Although an action for money had and received may be based on money paid under mistake of fact or law, *that is not the only basis for the action*. Maryland cases have found it available to recover money . . . paid under an executed illegal contract." And, the court recognized that Bourgeois was proceeding not under the "mistake" branch of the action, but rather under the branch pertaining to money paid under an illegal contract. *Id.*; *cf. Dua v. Comcast Cable of Maryland, Inc.*, 370 Md. 604, 646, 805 A.2d 1061, 1086 (2002) ("[T]he general principle, that the common law does not recognize an action to recover money voluntarily paid under a mistake of law, is obviously inapplicable under circumstances where the common law specifically recognizes an action to recover excess interest which had been voluntarily paid."). Thus, the distinction between mistakes of fact and mistakes of law is not relevant to plaintiff's claim.

Defendants' argument is also untenable as a factual matter. Even if the voluntary payment doctrine applied without regard to whether the parties were *in pari delicto*, it would not apply here under the alleged facts. As discussed, the "voluntary payment doctrine" only bars recovery if the plaintiff had "full knowledge of all the facts." *Poe's* § 119. On the other hand, if a plaintiff's "'assent is only induced by the conviction . . . that a particular fact existed, . . . the error destroys the whole basis of the agreement, and the parties are restored to their original condition and rights.'" *Id.* (quoting *Faunce*, 6 Gill at 77–78). Thus, a plaintiff who relies on a

misconception of fact in making a payment is not barred from recovery by the voluntary payment doctrine.

Bourgeois plainly alleges that he relied on a misconception of fact in agreeing to pay the service charges. Although Bourgeois was aware that Ticketmaster was charging him a service fee, he alleges that he was *not* aware that Ticketmaster paid a portion of that service fee to the Lyric. *See* Compl. ¶ 43 ("[Defendants] intentionally failed to disclose that a portion of [the service charges] were used to pay kickbacks to the Lyric."); *id.* ¶ 25 ("Unknown to consumers, however, the Lyric has conspired with Ticketmaster to obtain more money from each ticket sold than the advertised price of each ticket."). And, he alleges that he would not have purchased the ticket had he known about the remittance to the Lyric. *See, e.g.*, *id.* ¶ 93 ("As a direct and proximate result of the false and misleading statements, Plaintiff [was] induced, *ab initio*, to pay charges . . . which were used as illegal kickbacks."); *id.* ¶ 80 ("If Plaintiff and Class members had then suspected that Defendants were operating a racketeering enterprise to facilitate the fraudulent scheme described herein . . . [they] would not have entered into transactions with Defendants."). Thus, assuming the truth of plaintiff's allegations, as I must at this juncture, the voluntary payment doctrine would not bar Bourgeois from recovery.

In a footnote, defendants acknowledge that plaintiff "arguably alleges" that he was under a mistake of fact regarding whether "a fraction of the transaction charges he paid allegedly were shared with the Lyric." Memo at 31 n.19. They attempt to avoid the consequence of this allegation by claiming that this alleged mistake of fact is irrelevant because defendants had "no duty to disclose" to plaintiff the apportionment of the fees. *See id.* at 35–37. But, defendants do not explain why the existence *vel non* of a tort duty has any bearing whatsoever on the voluntary

payment doctrine. The relevant inquiry for the voluntary payment doctrine is whether plaintiff had "full knowledge of all the facts," not whether he had full knowledge of the facts which defendants had a tort duty to disclose to him.

In sum, defendants have not shown that plaintiff's claim for money had and received is barred as a matter of law or fact by the voluntary payment doctrine. Accordingly, I will deny defendants' motion to dismiss Count I of plaintiff's Complaint.

*Count II: Negligent Misrepresentation*

In the second count of his Complaint, Bourgeois alleges that the defendants negligently made "false and misleading representations and/or omissions," including that "fees charged as 'service' charges were for service when they were kicked back to venues such as the Lyric." Compl. ¶¶ 92–93. In *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 136, 916 A.2d 257, 273 (2007) (quotation marks omitted), the Maryland Court of Appeals set forth the elements of a claim for negligent misrepresentation under Maryland law:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

Numerous Maryland cases are to the same effect. *See, e.g.*, *Griesi v. Atlantic Gen'l Hosp. Corp.*, 360 Md. 1, 11, 765 A.2d 548, 553 (2000); *Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80, 94 (2010); *Valentine v. On Target*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999); *BG & E v. Lane*, 338 Md. 34, 43, 656 A.2d 307, 311 (1995); *Gross v. Sussex, Inc.*, 332 Md. 247, 256, 630 A.2d 1156, 1161 (1993); *Weisman v. Connors*, 312 Md. 428, 444, 540 A.2d 783, 791 (1988); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 336–37, 439 A.2d 534, 539 (1982);

*Virginia Dare Stores v. Schuman*, 175 Md. 287, 291–92, 1 A.2d 897, 899 (1938); *see also Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*, 264 F. Supp. 2d 282, 290–91 (D. Md. 2003).

Defendants argue that Bourgeois's allegations fail to satisfy the first element of this test. They posit that Bourgeois failed to allege "any misrepresentations on which Plaintiff could have justifiably relied." Memo at 38.

Bourgeois alleges two sorts of misrepresentations. First, he alleges that defendants "represented to him that the additional service charges were legitimate and collectible." Compl. ¶ 43. Defendants maintain that they made no such representation. According to defendants, "the mere assessment of a transaction charge, without more, does not constitute an implicit representation that the charge is . . . lawful." Memo at 38. In support, defendants cite *Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 988 (D. Md. 2002) *aff'd*, 92 F. App'x 933 (4th Cir. 2004). I agree with defendants.

In *Miller*, the trial court addressed whether a statement of charges by a lender served as a representation that those charges were permitted by law. It recognized that, "'[f]or consumer protection purposes, the meaning of any statement or representation is determined not only by what is explicitly stated, but also by what is reasonably implied.'" *Miller*, 224 F. Supp. 2d. at 988 (quoting *Golt v. Phillips*, 308 Md. 1, 9, 517 A.2d 328 (1986)). Although the district court acknowledged that the statement of charges might have represented that the lender "had the right to enter into a lender-borrower relationship involving a loan secured by a secondary mortgage," it did not also imply "that the specific terms of the contract—the various listed charges—

conformed with the law." *Id.* The district court explained, 224 F. Supp. at 988–89, that to hold

that a statement of charges necessarily represented that those charges were legitimate

> would lead to absurd results, not clearly contemplated by the Maryland
> legislature. Bookies, for example, routinely tell gamblers how much they stand to
> win (in terms of the quoted odds). Only a fool more foolish than most gamblers
> would believe the odds they are quoted vouch for the legality of the wager. And
> while bookies may violate a congeries of laws by taking bets, they do not also
> commit fraud by obtaining money for their services.

This aspect of Bourgeois's claim is on all fours with *Miller*. Just as in *Miller*, defendants

presented plaintiff with a list of charges for his ticket purchase. Although this may have

represented that defendants were permitted to sell tickets to events in Baltimore (which they

were), it did not imply that the particular charges were "legitimate and collectible." In fact,

plaintiff's attempted defense of the viability of this allegation, Opp. at 47 n.30, proceeds entirely

from the debunked premise that Ticketmaster was required to obtain a license before selling

tickets in Baltimore. In light of *Miller* and the cases cited therein, it is clear that plaintiff's

allegation that defendants represented that the fees were "legitimate and collectible" cannot

support his claim of negligent misrepresentation.

The second sort of misrepresentation plaintiff avers concerns the allegedly undisclosed

remittance of a portion of the service charges from Ticketmaster to the Lyric. For example,

Bourgeois alleges that defendants represented that the $12 fee they charged Bourgeois was for

"service" when in reality it was partially earmarked as a kickback to the Lyric. Compl. ¶ 71.

However, in my view, Ticketmaster's labelling of the $12 fee—whether as a service charge,

processing fee, convenience fee, or delivery fee—does not constitute any sort of representation

about how Ticketmaster would use the $12. Like many businesses, Ticketmaster undoubtedly

allocates the revenue it collects for a variety of purposes, such as paying salaries, overhead,

advertising, and legal fees, to name a few. And, it apparently also pays the Lyric for the right to be the exclusive ticket seller for events at the Lyric. In this day and age, it is not surprising that, in exchange for the exclusive right to sell concert tickets at a particular venue, the ticket seller pays to the venue a portion of any service fees it collects. The fact that the $12 is labelled as a "service charge" does not make any representation about the particular ways in which the fee would be used.[26]

Moreover, even if calling the $12 fee a "service charge" constituted a representation, it would not constitute a *mis*representation. Characterizing the fee as a "service charge" is not objectively false: It is the fee that customers are charged for the service that Ticketmaster provides. The fact that one of Ticketmaster's costs of doing business is a payment to the Lyric does not transform the "service charge" into anything other than a charge for Ticketmaster's services. *Cf. MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 657 (6th Cir. 2013) (affirming dismissal of misrepresentation and fraud claims because "'[a] plaintiff's subjective misunderstanding of information that is not objectively false or misleading cannot mean that a defendant has committed the tort of fraudulent misrepresentation.'" (citation omitted)).

Similarly, Bourgeois asserts that defendants represented that the ticket price payable to the Lyric was $52, when in reality it was $52 plus the portion of the service charges remitted to the Lyric. *Id.* ¶ 70. However, the fact that the $52 was designated as the ticket price is not a representation as to whether the Lyric would also collect revenue from another source.

---

[26] A useful analogy is an arrangement between a property manager and a property owner, pursuant to which the property manager receives a portion of the "rent" that tenants pay to the property owner. The fact that the property owner remits a portion of the rent to the property manager surely does not transform the label of "rent" into a misrepresentation.

Accordingly, I conclude that plaintiff has failed to allege any misrepresentation that could form the basis of tort liability for negligent misrepresentation. Accordingly, I will dismiss Count II of plaintiff's Complaint.[27]

### Count III: Maryland Consumer Protection Act

Bourgeois alleges that defendants violated several provisions of the Maryland Consumer Protection Act ("MCPA"), C.L. §§ 13-301 *et seq.* and 13-303 *et seq.* To survive a motion to dismiss on these claims, a plaintiff must allege "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation." C.L. § 13-301; *see Lloyd*, 397 Md. 108, 141 n.13, 916 A.2d 257, 276 n.13 (2007). As already discussed, plaintiff has failed to allege a false or misleading representation. Accordingly, Count III will be dismissed.

### Count IV: Deceit by Non-Disclosure or Concealment

Count IV of plaintiff's Complaint alleges deceit or fraud by non-disclosure or concealment. This count comprises two similar, yet distinct, claims sounding in fraud. *See Fegeas v. Sherrill*, 218 Md. 472, 476, 147 A.2d 223, 225 (1958) ("Concealment and non-disclosure are closely related and in any given situation usually overlap.").

Fraud based on active suppression of material facts is the variety of fraud referred to as "fraudulent concealment." The Maryland Court of Appeals has said: "Fraudulent Concealment 'is any statement or other conduct which prevents another from acquiring knowledge of a fact,

---

[27] Given the posture of the case as a putative class action, I note that even if plaintiff has properly alleged negligent misrepresentation, it is unlikely that a class would be certified on that claim. An element of a negligent misrepresentation claim is reliance, and the Fourth Circuit has cautioned that "proof of reliance is generally individualized to each plaintiff allegedly defrauded, [meaning that] fraud and negligent misrepresentation claims are not readily susceptible to class action treatment, precluding certification of such actions as a class action." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004).

such as diverting the attention of a prospective buyer from a defect which otherwise, he would have observed.'" *Lloyd*, 397 Md. at 138, 916 A.2d at 274.  In other words, it describes a "situation where the defendant actively undertakes conduct or utters statements designed to, or that would, divert attention away from" a material fact.  *Id.* at 138 n.11, 916 A.2d at 274 n.11.

"'To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact.  The affirmative suppression of the truth must have been with intent to deceive.'" *Fegeas*, *supra,* 218 Md. at 476-77, 147 A.2d at 225-26 (citation omitted).  In *Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 536, 958 A.2d 385, 396 (2008), the court explained, *id.* (internal citation omitted) (alterations in *Rhee*):

> [T]he concealment or suppression [of a material fact] is in effect a representation that what is disclosed is the whole truth.  The gist of the action [for fraud] is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant. . . .

On the other hand, a claim of deceit by nondisclosure "requires only that the defendant remain silent about, or omit, facts." *Lloyd*, 397 Md. at 38 n. 11, 916 A.2d at 274 n.11.  A claim for deceit by nondisclosure will only lie if "the defendant had a duty to disclose." *Id.*  Maryland courts have formulated the elements of the cause of action as follows:

> (1) [T]he defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment.

*Blondell v. Littlepage*, *supra*, 413 Md. at 119, 991 A.2d at 94 (emphasis omitted, internal quotation marks omitted) (quoting *Lloyd*, 397 Md. at 183, 916 A.2d at 274); *see Green v. H & R*

*Block, Inc.*, 355 Md. 488, 525, 735 A.2d 1039, 1059 (1999); *Cent. Truck Ctr., Inc. v. Cent. GMC, Inc.*, 194 Md. App. 375, 394, 4 A.3d 515, 526 (2010).

As indicated, the non-disclosed fact must be material, which means that it must be one on which a reasonable person would rely in making a decision. *Sass v. Andrew*, 152 Md. App. 406, 430, 832 A.2d 247, 260 (2003). Moreover, the misrepresentation must be made with the deliberate intent to deceive. *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188, 193 (1998); *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 230, 652 A.2d 1117, 1124 (1995). And, the plaintiff must justifiably rely on the materially incomplete representation. *See, e.g., B.N. v. K.K.,* 312 Md. 135, 151–53, 538 A.2d 1175, 1183 (1988).

Additionally, as discussed, Fed. R. Civ. P. 9(b) imposes a heightened pleading standard for allegations of fraud. Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Under the rule, a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *First Kuwaiti Gen'l Trading & Contracting Co.*, *supra*, 612 F.3d at 731 (citation omitted). As indicated, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II*, *supra*, 660 F.3d at 353 (citation omitted).

As is clear from the foregoing, a plaintiff proceeding under either theory of fraud must allege that the defendants specifically intended to deceive or defraud him. Moreover, under the pleading standards set forth in *Twombly*, *supra*, 550 U.S. at 556, the Complaint must set forth

"enough factual matter (taken as true) to suggest" a cognizable cause of action. In other words, the Complaint must contain facts sufficient to give rise to a plausible inference of defendants' specific intent to defraud. *See id.* at 570; *see Iqbal*, *supra*, 556 U.S. at 684. In my view, plaintiff's Complaint falls woefully short of satisfying this standard.

In *Iqbal*, the plaintiff sued John Ashcroft, the former Attorney General of the United States, and several other high ranking federal officials, alleging their liability under 42 U.S.C. § 1983 for adoption of "an unconstitutional policy that subjected [plaintiff] to harsh conditions of confinement on account of his race, religion, or national origin." 556 U.S. at 666. The plaintiff alleged in his complaint that the defendants "'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest.'" *Id.* at 669 (quoting complaint). The Supreme Court held that such "bare assertions" amounted to "nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim," and that, as such, "the allegations are conclusory and not entitled to be assumed true." *Id.* (quoting *Twombly*, *supra*, 550 U.S. at 555). The Court emphasized its earlier guidance in *Twombly* with respect to the federal pleading standard: "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).

Here, as in *Iqbal*, plaintiff's allegations as to defendants' specific intent amount to mere "labels and conclusions." Plaintiff baldly alleges that the defendants "reached an agreement or understanding to knowingly and willfully cheat and defraud Named Plaintiff . . . through their

intentional concealment of the fact that the charges imposed by Defendants . . . included secret kickbacks." Complaint ¶ 114. Similarly, plaintiff alleges: "Through their concealments of material fact, Defendants intended to induce Named Plaintiff . . . to act differently than [he] would have acted had [he] known the true facts." *Id.* ¶ 112. But, these are mere "formulaic recitation[s] of the elements of [the] cause of action." *Twombly*, 550 U.S. at 555. The Complaint is wholly lacking in the underlying factual allegations that would make these legal conclusions plausible.

As discussed, plaintiff does not allege any affirmative misrepresentations made by defendants. Moreover, plaintiff alleges no facts that plausibly suggest that defendants labelled the $12 fee as a service charge with the specific intent to conceal from plaintiff (and other consumers) the fact that a portion of that fee would be paid to the Lyric. The far more plausible inference is that Ticketmaster labelled them as "service charges" because they are charges for the service of procuring and processing tickets to particular events. *See Picard v. Kohn*, 907 F. Supp. 2d 392, 400 (S.D.N.Y. 2012) ("Under *Twombly*, where several different theories might explain the same conduct, a complaint must provide a factual basis for the specific theory on which its legal claims rely").

Nor do plaintiff's allegations give rise to a plausible inference that Ticketmaster declined to disclose the manner in which it would distribute the fees with the specific intent to defraud ticket buyers. The far more plausible inference—which plaintiff's factual allegations do not attempt to refute—is that Ticketmaster did not disclose how it allocated or used the $12 it collected from plaintiff because businesses, as a general matter, do not disclose to customers how they utilize the revenue they collect. *Cf. Twombly*, 550 U.S. at 557 ("When allegations of

parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.").  Moreover, Ticketmaster publicly disclosed in its filings with the Securities and Exchange Commission ("SEC") that a portion of the fees it collects are paid back to the venues for which it sells tickets.  *See* Ticketmaster 10-K, filed Feb. 25, 2013; *see also* Memo at 5–6 n.4.[28]  And, plaintiff cites this very document multiple times in his Complaint.  *See* Complaint ¶¶ 14–16.  In light of the foregoing, plaintiff's sparse factual allegations do not give rise to a plausible inference that Ticketmaster had the specific intent to defraud its customers by failing to disclose that it would remit to the Lyric a portion of the fees it collected as service charges.  Additionally, it is exceedingly doubtful that defendants' nondisclosure was "material" or that plaintiff took action in reliance on the omission—*i.e.* that he would have backed out of his purchase had he known that the Lyric would receive a portion of the service fee he agreed to pay.[29]

Accordingly, Count IV of plaintiff's Complaint will be dismissed.

*Counts VI–XI: RICO*

Plaintiff alleges multiple violations of the federal RICO statute against various combinations of the defendants.  RICO is "'a unique cause of action that is concerned with eradicating organized, longterm, habitual criminal activity.'"  *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir.2010) (citation omitted).  Because the penalties authorized by RICO are "drastic," in order "to provide society with a powerful response to the

---

[28] I may take judicial notice of documents publicly filed with the SEC.  *See In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 390 n.7, n.10 (4th Cir. 2005).

[29] It seems more likely that a local ticket purchaser would prefer a local performance venue to receive some of the money paid to a company without ties to the region.

dangers of organized crime," courts "must . . . exercise caution 'to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions . . . .'" *Id.* In other words, RICO "is not a cause of action to be pled lightly," and "'RICO treatment is reserved for conduct whose scope and persistence pose a special threat to social well-being.'" *Biggs v. Eaglewood Mortgage, LLC*, 582 F. Supp. 2d 707, 714 (D. Md. 2008) (citation omitted), *aff'd,* 353 F. App'x 864 (4th Cir. 2009).

To state a civil RICO claim, plaintiff must allege that defendants engaged in "a pattern of racketeering activity." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000). "Racketeering activity" is defined as any of a number of predicate criminal acts, including mail fraud, wire fraud, and interstate transport of money fraudulently obtained. *See* 18 U.S.C. §§ 1961(1)(B). A pattern of racketeering requires at least two predicate acts. *See id.* § 1961(5). Plaintiff's RICO allegations are predicated on the underlying crimes of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and interstate transport of money fraudulently obtained (18 U.S.C. § 2314). *See generally Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 844 (D. Md. 2013) (discussing similar RICO claims). To state claim for mail or wire fraud, a plaintiff must allege "specific intent to defraud." *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012) ("To be convicted of mail fraud or wire fraud, a defendant must specifically intend to lie or cheat or misrepresent with the design of depriving the victim of something of value.").

For the reasons discussed previously, plaintiff has not alleged any fraudulent representation or misrepresentation and, in any event, his allegations do not give rise to a

plausible inference that defendants acted with the specific intent to defraud their customers. Accordingly, plaintiff's RICO claims will be dismissed.

### Conclusion

For the foregoing reasons, defendants' Motion to Dismiss (ECF 60) will be denied as to Count I and granted as to Counts II–XI.  An Order follows.


Date: March 10, 2014

_____/s/_____
Ellen Lipton Hollander
United States District Judge